[Criminal No. 429.   Filed February 16, 1918.]

[170 Pac. 869.]

## JOSEPH L. WILEY, THOMAS JOHNS and RAMON SALAZAR, Appellants, v. STATE, Respondent.

1. ARREST—ARREST WITHOUT WARRANT—AUTHORITY OF PEACE OFFICER—STATUTE.—Under Penal Code of 1913, section 854, practically restating the common-law authority of a peace officer, such an officer, without warrant, may arrest a person when there is reasonable cause to believe that he has committed a felony, as by robbing and beating a woman.

2. ARREST — ARREST WITHOUT WARRANT — REASONABLE SUSPICION OF FELONY.—Before peace officers, seeking to apprehend persons guilty of felony by robbing and beating a woman at an amusement park, could forcibly stop an automobile on the highway, the surrounding facts and circumstances must have been such as to induce, in the mind of a reasonably cautious and prudent person, the belief or well-founded suspicion that the occupants of the car had committed the felony.

3. HOMICIDE — QUESTION FOR JURY—ARREST WITHOUT WARRANT—REASONABLE CAUSE TO SUSPECT FELONY.—Where there is no dispute as to the facts, whether peace officers had reasonable or probable cause to suspect the commission of felony by persons one of whom they killed by firing at the automobile in which such persons rode, was a question of law for the court, in the prosecution of the officers for murder.

4. ARREST — ARREST WITHOUT WARRANT — REASONABLE SUSPICION OF FELONY.—Where peace officers were proceeding to an amusement park at midnight in an automobile on information that a woman had been beaten and robbed, and perceived another automobile in front of them, both cars having a speed of about 25 miles an hour, and their mufflers being open so that the occupants of the car ahead could not hear the officers' summons to stop, the officers did not have reasonable and probable cause to suspect the commission of felony by the occupants of the other car, justifying them in arresting without warrant, or attempting to do so by firing at the car, one of whose occupants they killed.

   [As to right of policeman to make and of citizen to resist arrest, see note in 84 Am. St. Rep. 679.]

5. FALSE IMPRISONMENT—IMPRISONMENT EFFECTED BY VIOLENCE OR MALICE — FELONY — STATUTE. — Under Penal Code of 1913, section 206, providing that if a false imprisonment be effected by violence, malice, fraud, or deceit, it shall be punishable by imprisonment in

the state prison for not less than one or more than ten years, when a false imprisonment is effected by violence or malice it is a felony.

6. HOMICIDE — FELONIOUS HOMICIDE — KILLING IN ENDEAVORING TO EFFECT FALSE IMPRISONMENT.—A peace officer who killed by shooting a person whom he was endeavoring to arrest illegally by violence was guilty of felonious homicide.

7. HOMICIDE — "MURDER" — "MURDER IN FIRST DEGREE" — "MURDER IN SECOND DEGREE" — STATUTE. — Murder is the unlawful killing of a human being with malice aforethought and by Penal Code of 1913, section 172, is first degree murder when perpetrated by poison, lying in wait, torture, or any other kind of willful, deliberate, and premeditated killing, or when committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, or mayhem, and all other kinds of murder are of the second degree.

8. HOMICIDE — "MANSLAUGHTER"—"VOLUNTARY MANSLAUGHTER"—"INVOLUNTARY MANSLAUGHTER" — STATUTE. — By Penal Code of 1913, section 175, manslaughter is the unlawful killing of a human being without malice, and is voluntary when committed on sudden quarrel or heat of passion, involuntary if perpetrated in commission of unlawful act not amounting to felony, or a lawful act which might produce death in an unlawful manner, or without due caution and circumspection.

9. HOMICIDE—EXCUSABLE HOMICIDE—STATUTE.—Homicide, though excusable under certain circumstances by Penal Code of 1913, sections 178–180, is never excusable where the person who commits it was at the time violating some law.

10. HOMICIDE—"MURDER IN SECOND DEGREE"—KILLING BY PEACE OFFICER FALSELY IMPRISONING.—A peace officer who shot to death a person whom he was endeavoring by violence unlawfully to arrest without warrant, on suspicion of felony, was guilty of murder in the second degree, though the killing was unintentional and by accident, since the killing of another in the commission of a felony, such as falsely imprisoning by violence, though unintentional and by accident, implies in law the malice necessary to constitute the killing murder in the second degree.

11. HOMICIDE — APPEAL—HARMLESS ERROR—MISDIRECTION.—Where the jury's verdict finding a defendant guilty of murder in the second degree is fully supported by the facts and the law, misdirection in charging the jury that he might be found guilty of the highest degree of homicide was harmless to such defendant.

12. ASSAULT AND BATTERY—ASSAULT WITH DEADLY WEAPON—ACT OF OFFICER IN SHOOTING AT AUTOMOBILE TIRE.—The act of a peace officer who, with others, was pursuing an automobile on the unjustifiable suspicion that the occupants had committed felony, in shooting in the direction of the car with the intention of puncturing a

tire, was unlawful, subjecting him to prosecution for the crime of assault with a deadly weapon.

13. HOMICIDE — KILLING BY PEACE OFFICER — LIABILITY OF FELLOW-OFFICER.—Where peace officers were pursuing an automobile without warrant under the unjustifiable suspicion that the occupants had committed felony, and one shot at the car and killed an occupant, thus committing murder in the second degree, and the others, without intention to take life, shot merely at a tire or at the car to stop it, they could not be charged with the killing committed by their fellow-officer, the fatal shot having been his act alone, and not having been aided or abetted by the others, such others being amenable for the result of their own acts only as the officer who did the killing was amenable for the result of his.

APPEAL from a judgment of the Superior Court of the county of Santa Cruz. W. A. O'Connor, Judge. Reversed and remanded, with directions as to Joseph L. Wiley and Ramon Salazar. Affirmed as to Thomas Johns.

### STATEMENT OF FACTS BY THE COURT.

The appellants were informed against and tried jointly upon the charge of murder alleged to have been committed on the twelfth day of April, 1916, in Pima county, Arizona, in the killing of one Mary Josephine Walsh Bates. They were convicted of murder in the second degree. In their appeal they complain that the court erred in the admission of evidence, in misdirecting the jury as to the law, in refusing instructions requested to be given to the jury by them, and in not ordering a new trial for insufficiency of the evidence to support the verdict and judgment.

For an intelligent understanding of the errors complained of, it is necessary that a detailed statement of the facts and circumstances of the case be set forth.

Pastime Park, a pleasure resort situate about three and one-half miles north of Tucson, on the Oracle road, was, on the night of the 11th of April, 1916, occupied and used by a circus. About 12 o'clock at night the sheriff's office at Tucson received a telephone call from Pastime Park stating "that a woman had been robbed of two thousand dollars' worth of jewelry and half beat to death," and asking that an officer be sent out to Pastime Park at once. In response to this telephone call, the sheriff secured a public service automobile and directed two of the appellants, Joseph L. Wiley and Thomas Johns, who were deputy sheriffs under him, to take the auto-

mobile and drive by the city hall where appellant Ramon Salazar, a city policeman of the city of Tucson, would join them. The automobile, on leaving the city hall, was occupied by the driver thereof and the three appellants. The sheriff had informed Johns and Wiley of the reported assault on the woman and the robbery at Pastime Park, and instructed them to go to Pastime Park, look the matter over, and report by telephone to him at the sheriff's office, where he would remain ready to supply more help if needed. Salazar, while at the city hall, had received a telephone call from Pastime Park advising him of the trouble, and asking for help, the message being, in substance, the same as that received at the sheriff's office.

It was shortly after 12 o'clock midnight when the appellants, with the information and instructions above detailed, left the city hall and proceeded north on the Oracle road in the direction of Pastime Park. It must have been a few minutes before that Captain John S. Bates and his wife, Mary Josephine Walsh Bates, left a friend's house in Tucson, where they had been spending the evening, for their home, situate on the Oracle road, about a mile and one-half north of Pastime Park; for, as the appellants were driving at a rapid rate of speed, they saw a machine ahead of them, which afterward turned out to be the Bates machine. The appellants testify that the machine they saw seemed to be coming in their direction, but, when within a distance uncertain and indefinitely estimated, it suddenly turned and proceeded north in the direction of Pastime Park; that they then directed their driver to speed up, which was done, and, coming upon or near the Bates machine, they claim to have called in a very loud voice to the occupants thereof to "stop," that "they were officers." This was repeated several times, they say, and, receiving no attention or recognition from the occupants in the advance car, the appellant Johns testified:

"I took my pistol and fired a shot toward the wheel, trying to puncture the tire. Q. For what purpose? A. To stop the car. Q. Why to stop the car? A. To find out who the parties were in the car."

He testified, further, that he fired another shot in the same direction a second or two after the first. Wiley fired one shot immediately after and over to the left and away from the Bates car, as he states. Salazar fired the next and last

shot in the direction of the Bates car, and, as he states, for the purpose of puncturing a tire. At this time both cars came to a standstill, the appellants' car on the left or west side of the Bates car, and about 25 feet in the lead. The above is the version of the affair as given by the appellants.

Captain Bates testified that he and his wife, the deceased, left Tucson for their country home about five minutes after 12 o'clock at night, going along the Oracle road at the rate of about 25 miles per hour; that he neither met nor saw any other machine than the appellants' on the trip; that he traveled north all the time uninterrupted until overtaken by the appellants; that he was driving the car and his wife was sitting at his left, and while well on the road, and not very far from Pastime Park, his wife remarked to him that a car was following behind; that he looked back and saw the bright lights of a machine following approximately 300 yards in the rear, and a little farther on his wife remarked, "Pull out of the road and let the machine pass"; that he gradually steered to the right until just off the crown of the road; that as he was proceeding along he heard a noise which he thought was either a blow-out or a shot; that he immediately pulled the emergency brake, put on the foot brake, and threw his car in neutral. He then remarked, "We have a blow-out," and turned his head in the direction of the noise. As he remarked, "We have a blow-out," his wife said, "I am shot." When he looked at his wife she was facing to the front, her head having fallen on the back of the seat of the machine. About that instant he saw a flash from which came three shots, which were directed toward him; that at the time of this occurrence the radiator of the appellants' machine was overlapping the tail-board of his machine and was about 25 feet to the left of his machine; that after the machine had stopped the appellants rushed toward his machine, pointing their revolvers in his direction; that one of the appellants stationed himself just to the rear of the seat where his wife was sitting, and the other two began overhauling the two boxes that were in the rear end of the car, stating that "they were officers of the law." One of them said, "We are officers of the law, and have instructions to search you for booze." He said to them, "You have shot my wife"; and Wiley remarked, "That is God damned nonsense"; that Johns said, "Oh, hell, she is just scared to death." The appellants asked Captain Bates

why he had turned around, and he said, "I told them I had not turned, that I had not altered my course while coming out." Captain Bates then told the appellants that his wife had fainted, and that he was going to Pastime Park or Charlie Loeb's to get some water to put on her head, which he then did without any interference from the appellants. When he arrived at Pastime Park, about a quarter of a mile north, he dampened his handkerchief in some water, and, on applying it to his wife's face and head, he discovered that she was dead—that she had been shot. The appellants also went to Pastime Park, and busied themselves in looking up the woman who was supposed to have been beaten and robbed. While engaged in this, they learned for the first time that Mrs. Bates had been shot and was dead. They telephoned, or caused the sheriff's office to be telephoned, what had happened, and remained there until the sheriff arrived and disarmed them.

Appellants deny that they used any profane or gruff language such as Captain Bates charges them with using, or that they, on approaching his car, pointed their pistols at him, or that they examined his car for liquors. Captain Bates was asked to describe the condition of his car as he took that journey northward, with reference to the noise it made. He said:

"The car is very noisy, the road is rough, the chains which hold up the tail-board were rattling up and down on the fenders which are over each rear wheel; in fact, every time I hit a bump they would jump up and down; the muffler of the machine was wide open, and the exhaust is directly in front of the driver, underneath the foot-board."

The driver of the appellants' machine stated that he did not see any machine on his way out, coming in his direction; also that his muffler was wide open; that cut-outs in both cars were open; that before any shots were fired the appellants shouted two or three times, and that four shots were fired by the appellants, "all shots to the right." "I heard Mrs. Bates scream"; that after the cars stopped he did not hear any conversation between the appellants and Captain Bates, only "grumbling"; that he could see a man and woman in the other car, but could not recognize them.

Three of the shots fired may be accounted for as follows: The first struck Mrs. Bates, killing her. One of the shots, perhaps the second, had gone through the tail-board of the Bates car at an angle indicating it must have been shot by

someone to the left and in the rear about 20 feet. A third shot, and most likely the one fired by Salazar, struck the left rear fender of the machine at a height about two feet and three inches above the ground. The other shot, if fired toward the machine, evidently missed its mark, as there was no evidence that it hit anything. The first two shots were fired by Johns, the third one by Wiley, and the fourth by Salazar. One witness said the night was cloudy, and others testified that there was no moon. The appellants did not know the Bateses, and did not know who was in the Bates car. They were alike strangers to each other.

Mr. A. A. Worsley, Mr. John T. Hughes and Messrs. Duffy & Purdum, for Appellants.

Mr. Wiley E. Jones, Attorney General, Mr. George W. Harben, Mr. R. W. Kramer, Assistant Attorneys General, and Mr. Geo. O. Hilzinger, County Attorney, for the State.

ROSS, J. (After Stating the Facts as Above).—The complaint as to the admission of evidence is without merit and will not be noticed. The court instructed the jury upon the theory that appellants, and each of them, might be found guilty under the facts as above detailed, of murder in the first degree, or murder in the second degree, or voluntary or involuntary manslaughter. The question is, Did the court give the law applicable to the facts, or did he misdirect the jury or fail to direct them as to the law pertinent to the facts of the case?

Giving our attention to the particular facts of this case for the moment, we find the appellants were officers of the law, specially clothed with the power and duty to run down and apprehend criminals and persons charged with and suspected of committing crimes. Two of them were deputy sheriffs of Pima county, and the other was a policeman of the city of Tucson. They had received information that a felony had been committed at a place where but a short time before a circus performance had taken place; a woman had been beaten and robbed of jewelry valued at $2,000. In going to the scene of the crime for the purpose of investigating the charge, and to search out and arrest the perpetrator of the crime, the appellants, it will be conceded by all, were in the performance of a legal duty. They had no warrant, nor was

one necessary under the law before they could make an arrest of any person if they had reasonable cause to believe he had robbed and beaten the woman.   Section 854 of the Penal Code provides, among other things:

"A peace officer . . . may, without a warrant, arrest a person: . . . (5) At night, when there is a reasonable cause to believe that he has committed a felony."

This section of the statute is a practical restatement of the common-law authority of a peace officer.

SHAW, C. J., in *Commonwealth* v. *Carey,* 12 Cush. (Mass.) 246–251, states the rule correctly, as we believe, as follows:

"If a constable or other peace officer arrest a person without a warrant, he is not bound to show in his justification a felony actually committed, to render the arrest lawful; but if he suspects one on his own knowledge of facts, or on facts communicated to him by others, and thereupon he has reasonable ground to believe that the accused has been guilty of felony, the arrest is not unlawful." *Commonwealth* v. *Phelps,* 209 Mass. 396, Ann. Cas. 1912B, 570, 95 N. E. 868.

Indeed, it has always been the law, where not restricted by statute, that a peace officer could, without a warrant, make an arrest of a person committing or attempting to commit a crime in his presence, or of a person who had committed a felony out of his presence, or one who, though guilty of no crime, he had reasonable cause to believe guilty of a felony. 2 R. C. L. 446; 5 C. J. 399; *Harness* v. *Steele,* 159 Ind. 286, 64 N. E. 875; *State* v. *Evans,* 161 Mo. 95, 84 Am. St. Rep. 669, and note 684, 61 S. W. 590.

Before the appellants could forcibly stop the Bates car, however, the surrounding facts and circumstances must have been such as to induce, in the mind of a reasonably cautious and prudent person, the belief or well-founded suspicion that the occupants of the car had committed a felony, or, as stated by SHAW, C. J., in *Bacon* v. *Towne,* 4 Cush. (Mass.) 217:

"There must be such a state of facts as would lead a man of ordinary care and prudence to believe, or entertain an honest and strong suspicion, that the person is guilty."

The statement of the crime committed at Pastime Park, while definite and certain in its character of a felony, did not name or describe the person accused of committing it, nor state whether he had fled from the scene of the crime or not. The sole and only reason the appellants had to suspect the

occupants of the Bates car was the fact that the appellants, as they state, believed the car was coming toward them and suddenly turned, and, when overtaken, refused to stop when spoken to. That neither Captain Bates nor the deceased heard the appellants' outcries is quite certain; and that it was not possible for them to hear the outcries, both cars going at the rate of approximately 25 miles an hour, with the mufflers on them both wide open, should have been realized by the appellants. If the Bateses had heard their outcries and refused to stop, no inference of guilt could have been reasonably drawn therefrom, as the situation was more suggestive of a holdup by highwaymen than an arrest by peace officers. "The wicked flee when no man pursueth" could not be said of them, for they had committed no wrong. However, we are satisfied that an ordinarily prudent man would have perceived the impossibility of the outcries made by appellants being heard by the occupants of the Bates car, under the circumstances. The Bateses were not fleeing from appellants, and slight reflection upon appellants' part, it seems, would have suggested that the Bateses might have been peaceable and respectable people traveling for a legitimate purpose on the public highways. We do not think that ordinary care and prudence would have dictated the course pursued by the appellants.

There is no dispute as to the facts in this case, and as to whether they constitute reasonable or probable cause is a question of law for the determination of the court (*People* v. *Kilvington*, 104 Cal. 86, 43 Am. St. Rep. 73, 37 Pac. 799); and we are satisfied that no reasonably prudent or cautious man would have shot at the moving car occupied by the Bateses in the manner the appellants did. The means used, therefore, by the appellants for the purpose of stopping the Bates car were unlawful; the act of trying to stop the car by shooting at it was an unlawful act. Captain Bates and the deceased, having committed no crime, were entitled to proceed on their way without interruption or molestation, to their destination, and no person or officer could forcibly interfere with their movements without violating the law. What the appellant Johns actually did was to shoot at the car in such a reckless and heedless manner as to kill one of the occupants and arrest the further progress of the other one. The personal liberty of both Captain Bates and the deceased was

violated. Section 205, Penal Code. When a false imprison-
ment is effected by violence or menace, under our statute, it
is a felony. Section 206, Penal Code. The means used by
the appellants to effect their purpose of stopping the Bates
car were of the most violent and threatening kind, so dan-
gerous and lethal, in fact, as to cause the death of Mrs. Bates.

The extent of the power of an officer to arrest on mere sus-
picion is well stated by HOBSON, J., in *Petrie* v. *Cartwright*,
114 Ky. 103, 102 Am. St. Rep. 274, 59 L. R. A. 720, 70 S. W.
297, and we quote his words with entire approval:

"We have been unable to find any common-law authority
justifying an officer in killing a person sought to be arrested,
who fled from him, where the officer acted upon suspicion,
and no felony had in fact been committed. The common-law
rule allowing an officer to kill a felon in order to arrest him
rests upon the idea that felons ought not to be at large, and
that the life of a felon has been forfeited; for felonies at
common law were punishable by death. But where no felony
has been committed, the reason of the rule does not apply, and
it seems to us that the sacredness of human life and the
danger of abuse do not permit an extension of the common-
law rule to cases of suspected felonies. To do so would be
to bring many cases of misdemeanor within the rule, for in
a large per cent of these cases the officer could show that he
had reasons to suspect the commission of a felony, and it
would be left entirely with him to say whether he was pro-
ceeding against the defendant for a misdemeanor or for a
felony. The notion that a peace officer may in all cases shoot
one who flees from him when about to be arrested is un-
founded. Officers have no such power, except in cases of
felony, and there as a last resort, after all other means have
failed. It is never allowed where the offense is only a misde-
meanor, and where there is only a suspicion of felony the
officer is not warranted in treating the fugitive as a felon
If he does this, he does so at his peril, and is liable if it turns
out that he is mistaken. He may lawfully arrest upon a sus-
picion of felony, but he is only warranted in using such force
in making the arrest as is allowable in other cases not feloni-
ous, unless the offense was in fact a felony."

That the person who fired the fatal shot is guilty of feloni-
ous homicide is quite clear, and we are only concerned in
determining its degree.

Murder is the unlawful killing of a human being with malice aforethought. It is first degree murder when perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or when committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, or mayhem; and all other kinds of murder are of the second degree. Section 172, Penal Code.

Manslaughter is the unlawful killing of a human being without malice; and, when committed upon a sudden quarrel or heat of passion, is designated voluntary. If it is perpetrated in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection, it is known as involuntary. Section 175, Penal Code.

Under certain circumstances, the law justifies or excuses a homicide (sections 178–180, Penal Code), but never where the person who commits it was himself at the time violating some law.

It is clear that the facts in this case do not bring it within the definition of first-degree murder, and it is quite as apparent that there are no mitigating circumstances reducing the killing to manslaughter. To constitute murder in the second degree, it is necessary that the killing should have been done with malice aforethought, as much so as a murder of the first degree; and this malice may be either express or implied. As was said in *Bennett* v. *State,* 15 Ariz. 58–62, 136 Pac. 276, 277, quoting from Wharton on Criminal Law:

"Malice, in law, does not necessarily mean hate, ill will, or malevolence, but consists in any unlawful act, willfully done, without just excuse or legal occasion, to the injury of another person. It may properly be said not to be a thing or entity, but rather a mental state or condition prompting the doing of an overt act without legal excuse or justification, from which act another suffers injury. Where the act is done with the deliberate intention of doing bodily harm to another, it is called express malice; otherwise the malice is inferred or presumed from the act. Evil intent is legal malice; so, also, is gross and culpable negligence whereby another suffers injury."

It seems to be well settled that where one, while commit-
ting a felony, kills another, even though it was unintentional
and was by accident, the law supplies the malice necessary to
constitute it murder in the second degree.

In an early case in California (*People* v. *Doyell*, 48 Cal. 85)
it was said:

"To establish the malice aforethought, however, the spe-
cific intent to kill need not be proved. To constitute a crime,
there must be a joint operation of act and intention. But
the common law measures an act which is *malum in se* sub-
stantially by the result produced, though not contemplated,
holding the doer of the act guilty of the thing done in the
same manner as if it were specially intended, though not
always guilty of the crime committed in the same degree.
*People* v. *Foren*, 25 Cal. 365. Whenever one, in doing an
act with the design of committing a felony, takes the life of
another, even accidentally, this is murder. Acts of 1850,
p. 220, § 25; 2 Bish. Cr. L. 741. In such homicides the law
superadds the intent to kill to the original felonious intent,
and estops the criminal from denying the further intent thus
imputed. The thing done, having proceeded from a corrupt
mind, is to be viewed the same, whether the corruption is of
one particular form or another. Ruth. Inst., c. 18, § 9; 1
Bish. Cr. L. 411."

Bishop, from the adjudicated cases, epitomizes the rule as
follows:

"If an act is unlawful or is such as duty does not demand,
and of a tendency directly dangerous to life, the destruction
of life by it however unintended, will be murder. But if the
act, though dangerous, is not directly so, yet sufficiently to
come under the condemnation of the law, and death un-
intended results from it, the homicide is manslaughter; or if
it is of a nature to be lawful properly performed, and it is
performed improperly, and death comes from it unexpectedly,
this also is manslaughter." 2 Bishop's Criminal Law, § 689.

Our statute, in effect, has said:

"The killing of a human being, unless it be murder in the
first degree, or manslaughter or excusable or justifiable homi-
cide, shall be murder in the second degree when perpetrated
intentionally, but without deliberation and premeditation."

In a note to *Whiteford* v. *Commonwealth*, 6 Rand. (Va.)
721, 18 Am. Dec. 771–786, it is said:

"In those states where all murder not of the first degree is declared to be of the second, the definition of the former degree defines the latter. And, in general, it may be laid down that any killing done maliciously, but without deliberation or premeditation, and not by any of the specified methods or in the commission of the enumerated felonies, is murder of the second degree."

As heretofore stated, appellant Johns fired the shot that killed the deceased, and in doing so, under the circumstances, *he* at least was guilty of murder in the second degree; but under no aspect of the case was he guilty of murder in the first degree, and the court, in advising the jury that he might be found guilty of the highest degree of homicide, committed error. Since the verdict of the jury is fully supported by the facts and the law, the misdirection does not prejudice the rights of the appellant Johns, and, that being so, his complaint is without merit.

A consideration of the evidence and the law convinces us that the conviction of the appellants Wiley and Salazar was not warranted. While it is shown that they were co-operating with Johns to stop the Bates car, there is no evidence of a previous understanding or agreement which would constitute conspiracy and make the act of one the act of all. The effort to stop the Bates car did not become unlawful until the appellants began shooting at it for the purpose of puncturing a tire thereof, and what took place thereafter was not the result of a mutual understanding or agreement, but was the spontaneous and individual acts of the appellants in what they might have conceived to be an emergency. The act of Salazar in shooting in the direction of the car, with the intention of puncturing a tire, was unlawful and would subject him to a prosecution for the crime of assault with a deadly weapon; yet, having no intention to take life, he could not, under the circumstances, be charged with a homicide committed by Johns. Acting as he did, *sua sponte,* he is amenable for the result of his own act, as Johns is amenable for the result of his act. There is a dispute in the evidence as to whether Wiley discharged his pistol in the direction of the Bates car or not. Captain Bates testified that he saw three flashes in his direction immediately after the first shot. Wiley's testimony is that he shot into the air and in the opposite direction from the Bates car. If his story is true, what

he did was not unlawful; but if he shot at the Bates car he is equally responsible with Salazar, the evidence disclosing no conspiracy. It will not do to say that the carelessness of one was the carelessness of all simply because they were together. While our statute makes all persons concerned in the commission of a crime, whether it be a felony or a misdemeanor, and whether they directly commit the act constituting the offense or aid and abet in its commission, principals in the crime so committed (section 27, Penal Code), we are persuaded that before Wiley and Salazar could be held responsible for the act of Johns they, together with Johns, in the circumstances, must have actually intended to take life. They not having inflicted the wound, nor, as we shall see, aided and abetted Johns in firing the fatal shot, may not be charged with what they did not do and what Johns did. Wiley and Salazar did not discharge their pistols until after Johns had fired twice in the direction of the Bates car. It was the first shot fired by Johns that killed the deceased. The act for which the appellants are being tried was accomplished by that one shot. It is not shown that Wiley and Salazar advised and encouraged the commission of this act by Johns, and it cannot be said that the shooting by them, after the homicide had been committed by Johns, in any way aided and abetted the latter in the commission of the homicide.

In the case of *Walker* v. *State,* 29 Tex. App. 621, 16 S. W. 548, the defendant was indicted as a principal in a murder charge:

"The evidence showed that . . . the defendant was engaged in taking home a man who was very much intoxicated; that, while they were traversing a narrow street crossing, deceased attempted to pass them from behind, but in doing so slipped and fell against defendant's companion, who thereupon drew his pistol and shot him; and that defendant, who was in advance, turned upon hearing the pistol shot, and struck deceased with his fist, knocking him down. It was not shown, however, that defendant knew of his companion's intention to take the other's life; and it was not contended that his blow added anything to the fatality of the pistol wound." (Syllabus.)

The court, commenting upon the state of facts, said:

"To make him guilty, he must have acted with Shearrar in taking the life of deceased. Did he do so? The fatal shot which took his life was fired before this defendant took any part in the matter. There is no evidence that he knew that Shearrar intended to take the life of the deceased. All the evidence shows that the transaction occurred unexpectedly and suddenly, under circumstances which could not have been anticipated by any of the parties. . . . Defendant, if he struck the deceased at all, did not strike him until after he had been fatally shot; and it is not contended that his blow added to the degree or fatality of the wound inflicted upon him by Shearrer's pistol shot."

It is not shown that any of the appellants intended to take life. The wrong that was committed doubtless grew out of a misconception on their part as to the extent of their powers and rights in acting as officers. The belief is too common among some peace officers that they are clothed with the power of life and death, to be exercised without caution or restraint while acting as purveyors of the peace. This false and dangerous belief by the appellants that they were exercising a right given them by the law doubtless accounts for the dreadful and fatal mistake resulting in the death of Mrs. Bates. We do not think, however, that the malice aforethought the law imputes to the act of Johns should also be imputed to those who happened to be with him, but who did not contribute to the killing. If every member of a posse should be made criminally responsible for the wrongful act of every other member, it would be extremely unsafe for peace officers, in a body, to pursue and arrest persons charged with or suspected of crime. In this instance, if all of the appellants had been shooting to kill, and one of them had inflicted the fatal wound, there would have appeared a common design and a co-ordination in its accomplishment that would doubtless make each responsible for the act of the other; but there being an absence of intention to take life, and no evil intent except the one imputed by law to the actual perpetrator of the homicide, we think, under the law, the other members of the party should be held responsible only to the extent of their individual criminal conduct, and that the superadded intent by construction of law should not be imputed to them.

The information in this case does not set forth the means used in the commission of the offense charged against the

appellants.   Its allegations, therefore, are not broad enough
to cover the offense of assault with a deadly weapon as might
have been had the means used in the commission of the homi-
cide been described in the information.   We are limited, then,
to reversing the case as to Wiley and Salazar, with directions
to the lower court to dismiss as to them.   The errors com-
plained of by appellant Johns, as we have seen, were not
prejudicial to his rights, and the judgment of conviction is
accordingly affirmed.

FRANKLIN, C. J., and CUNNINGHAM, J., concur.