[Civil No. 1860. Filed December 28, 1920.]

[194 Pac. 88.]

## J. T. MILES, Sheriff of Pima County, Appellant, v. HELEN WRIGHT and Her Husband, J. R. WRIGHT, Appellees.

1. OFFICERS—ACTION AGAINST OFFICERS OF SEVERAL COUNTIES MAY BE BROUGHT AT PLACE WHERE EITHER HOLDS OFFICE.—Under Civil Code of 1913, paragraph 394, subdivision 16, as to venue of action against public officers, action against officers of several counties on a joint or several liability may be in the county where either holds office.

2. VENUE—APPLICATION FOR CHANGE DEPRIVES COURT OF JURISDICTION ONLY BY SHOWING ACTION IN WRONG COUNTY.—Under Civil Code of 1913, paragraph 396, application for change of venue deprives the court of jurisdiction, other than to order change, only on showing action was brought in wrong county.

3. VENUE—ACTION FOR TRESPASS TO PERSON BY SHERIFF MAY BE IN EITHER OF SEVERAL COUNTIES.—Civil Code of 1913, paragraph 394, subdivision 10, authorizing suit for damages for trespass to be brought in county of trespass or where either defendant resides or may be found, applies to a trespass against the person by sheriffs.

4. ARREST—MAY BE WITHOUT WARRANT BY PEACE OFFICER WITH REASONABLE CAUSE TO BELIEVE PERSON GUILTY OF FELONY.—Under Penal Code of 1913, section 854, a peace officer may without a warrant arrest a person whom he has reasonable cause to believe guilty of a felony.

5. FALSE IMPRISONMENT—COMPLAINT HELD TO SHOW DEPUTY IN MAKING ARREST ACTED IN SUCH CAPACITY.—Complaint against a sheriff for unlawful arrest and false imprisonment by his deputy sufficiently shows that the deputy acted in his capacity as such in arresting plaintiff; it alleging that he told her that he had been ordered by the sheriff of another county to arrest her and stated to her that she had stolen a large sum of money, and that he showed her his deputy's badge and told her that was his authority.

6. FALSE IMPRISONMENT—SHERIFF IS LIABLE FOR DEPUTY'S ARREST OF WRONG PERSON—"OFFICIAL ACT."—An "official act," within Civil Code of 1913, paragraph 2538, making a sheriff responsible for the official acts of his deputy, is any act done by the officer in his official capacity under color and by virtue of his office, and so includes his act when ordered to arrest one person, in arresting, by mistake, another without reasonable ground to believe him to be the guilty person.

7. FALSE IMPRISONMENT—COMPLAINT HELD TO SHOW, AGAINST GENERAL DEMURRER, THAT ARREST BY DEPUTY WAS FOR FELONY.—The complaint on a sheriff's bond based on an arrest by his deputy of plaintiff without a warrant sufficiently states, as against a general demurrer, that the offense was a felony, by allegation that he arrested her on a charge of having stolen "a large sum of money."

8. ACTION—RULE AGAINST JOINDER NOT VIOLATED, BY ACTION AGAINST PRINCIPAL AND SURETY ON OFFICIAL BOND.—Under Civil Code of 1913, paragraphs 197–199, as to liability under duties covered by, and action on, an official bond, an action thereon against principal and surety is not in violation of paragraph 427, prohibiting joining of actions ex contractu with actions ex delicto.

9. FALSE IMPRISONMENT—EVIDENCE OF DEPUTY'S ACT BEING OFFICIAL SUFFICIENT FOR JURY.—Evidence held sufficient, as against motion for instructed verdict, to take to the jury the question of the act

4. On liability of officer for making arrest without a warrant, see note in 51 L. R. A. 206.

6. On liability for arresting wrong person, see notes in 44 Am. Dec. 291; 8 Ann. Cas. 34.

On liability of sheriff for deputy's tort in making arrest, see notes in Am. Dec. 145; 12 L. R. A. (N. S.) 1019; L. R. A. 1915E, 172; 1 A. L. R. 241; 12 A. L. R. 981.

of a deputy sheriff in making an unlawful arrest being official, and so one for which the sheriff was liable, rather than individual.

10. SHERIFFS AND CONSTABLES—SHERIFF LIABLE FOR OFFICIAL ACT OF DEPUTY THOUGH NOT KNOWING IT WAS CONTEMPLATED.—Under Civil Code of 1913, paragraph 2538, declaring a sheriff responsible for official acts of his deputy, so long as the deputy's act is under color and by virtue of his office, the sheriff's lack of knowledge that such act was about to be performed is immaterial.

11. FALSE IMPRISONMENT—KNOWLEDGE OF SHERIFF OF DEPUTY'S ACTION INFERRED.—There being no rules or regulations of a sheriff's office attempting to limit a deputy's authority to make arrests without warrant, but it being the custom or habit of deputies to act without warrant on a telephone message from another sheriff to make an arrest, the law would, if necessary to hold the sheriff responsible for such an act of his deputy, infer knowledge of the sheriff that this would be done.

12. TRIAL—LIMITED PURPOSE OF TESTIMONY SUFFICIENTLY EXPLAINED BY COURT'S STATEMENT.—From the statement of the court, on refusing to strike plaintiff's testimony that her husband was with Uncle Sam's service in France, that the service in which he was engaged was immaterial in determining whether anything was due plaintiff, the jury must have understood the limited purpose of the testimony to be the explaining of the absence from the trial of plaintiff's husband, which she had a right to do, it being in evidence that she was married, so that defendant was not prejudiced thereby.

APPEAL from a judgment of the Superior Court of the County of Maricopa. R. C. Stanford, Judge. Affirmed.

Mr. Edwin F. Jones, for Appellant.

Mr. Jesse C. Wanslee, and Messrs. Sprowls & Downing, for Appellees.

ROSS, J.—Plaintiff brought this suit for damages against J. T. Miles as sheriff, and George Holloway as deputy sheriff, of Pima county, and J. G. Montgomery as sheriff of Maricopa county, Arizona, and the Maryland Casualty Company as the bondsman for the two sheriffs, charging the officers with a joint trespass in unlawfully arresting and falsely imprison-

ing her. The material facts alleged in her complaint are:

"That on the evening of February 28, 1919, and in answer to a telegram announcing the serious illness of plaintiff's mother-in-law, living at Mathis, Texas, plaintiff left the city of Phoenix over the Arizona Eastern Railroad via Maricopa for said Mathis, Texas. That she changed trains at Maricopa, taking an east-bound Southern Pacific train which passed through Maricopa about 10:30 P. M. of the same evening, and secured a berth thereon in a sleeping-car attached to said train, and some time just after midnight, the same being March 1, 1919, and after she had passed through the city of Tucson, Arizona, the said George Holloway came to her berth, awakened her, and placed her under arrest, stating to her that the sheriff of Maricopa county had ordered him to arrest her. That she inquired of him the reason for her arrest, whereupon he stated that she had stolen a large sum of money from a man in Phoenix. She protested her innocence and showed him, the said George Holloway, the telegram calling her to Texas and also her marriage license bearing her true name, but he sneeringly told her that he did not believe that stuff, and that she was the woman he wanted, and that she must prepare to leave the train with him at the next stop. That said defendant, George Holloway, went with her to the ladies' dressing-room on said train and compelled her to take off her nightrobe in his presence and to put on other clothes. That while she was dressing he opened her grip and examined her private effects, some of which were not suitable for strangers to see. That the said plaintiff asked the said defendant, George Holloway, whether or not he had a warrant for her arrest, and he showed her his deputy's badge and told her that was all the authority he needed. That when the train on which she was traveling arrived at the station at Benson, Arizona, the said George Holloway forcibly compelled plaintiff to get off the said train with him, which she did, about 2 o'clock at night of March 1, 1919, where he held her under restraint and arrest

for about 12 hours, when he released her and allowed
her to proceed on her way to Mathis, Texas. That
plaintiff has been informed and believes, and on such
information and belief alleges as a fact, that defend-
ant J. G. Montgomery, sheriff of Maricopa county,
Arizona, by telephonic communication, directed the
sheriff of Pima county to arrest the said plaintiff.
That on account of the wrongful arrest and detention
of plaintiff by the said defendants, plaintiff was
frightened and excited and greatly inconvenienced
and suffered great bodily harm, humiliation, and dis-
tress; that her nerves were shattered, and she was
made ill thereby. That she was wrongfully arrested
and restrained by the said deputy sheriff and the
other defendants herein, who acted without any war-
rant; the said deputy sheriff stating that he was a
deputy sheriff of Pima county, Arizona, and that he
had been ordered to arrest plaintiff.''

This complaint was filed August 13, 1919. Defend-
ants Montgomery and his surety, the Maryland
Casualty Company, on August 25th, filed their answer
consisting of general demurrer and general denial. De-
fendants Miles and his surety, the Casualty Company,
and Holloway, on September 8, 1919, filed an affidavit
by their attorney stating, among other things, that
the alleged arrest complained of was made, if at all,
in the county of Pima, and asked that the case be
transferred to Pima county, of which they, Miles and
Holloway, were public officers and entitled, as such,
to have the case tried in said county. On the same
date these defendants filed separate answers and
demurrers.

Thereafter the demurrer of defendants Mont-
gomery and his surety company was sustained and
plaintiff given time to amend her complaint, which
was done. The amendment simply substituted a
direct allegation instead of one on ''information and
belief'' against Sheriff Montgomery, and is in the
following words:

"That the said J. G. Montgomery, sheriff of Maricopa county, advised and requested the said J. T. Miles, sheriff, and George Holloway, deputy sheriff, to arrest said plaintiff and, in so advising and directing the arrest of said plaintiff, the said J. G. Montgomery, acting as such sheriff, exceeded his authority and acted without a warrant when in fact he had no complaint nor warrant for plaintiff's arrest."

The application of defendants Miles, his surety, and Holloway, to transfer the case to Pima county, was taken up at a later date and denied. The case proceeded to trial before a jury. The jury's verdict was in favor of Montgomery, but against the other defendants, for the sum of $1,800. From the judgment entered thereon sheriff Miles, only, prosecutes this appeal.

It is strenuously contended by defendant Miles that the verified application for a transfer of the case to Pima county had the effect of depriving the court of all power over the case except to make the order of transfer. Whether this is true or not, we think, depends upon the facts of the case as disclosed by the complaint and the application, when examined in connection with the law concerning the venue of suits. The application for transfer is in harmony with the allegations of the complaint as to the official capacity of defendants and the counties of which they are officers. The only additional fact set forth in the application that could in any way affect the venue is that the alleged false imprisonment occurred in Pima county, if at all; this fact not being stated in the complaint.

The general rule, as fixed by the statute, is that "no person shall be sued out of the county in which he resides" (paragraph 394, Civ. Code); but there are a number of exceptions to this rule. One is that—

"Suits against public officers must be brought in the county in which the officer, or one of several officers, holds his office." Subdivision 16, par. 394, *supra*.

Since the official and private residence of county officers must, under the law, coincide, this provision does not, as to them, change or alter the general rule except when the cause of action is against public officers of different counties, in which event the suit may be brought in either county. If the officers sued are shown by the complaint to be officers of different counties and the facts alleged evidence a joint or several liability, then none of the defendants has a privilege or right to be sued in the county in which he holds his office. Paragraph 396, Civil Code, provides that a transfer may be had upon application, "if the county in which the action is brought be not the proper county as provided in paragraph 394." This presupposes a showing, either from the complaint or application, or both, that the defendant asking the transfer is privileged to be sued in another county than the one where the suit was brought. No such showing being made in this case, the court properly refused to order a transfer of the cause to Pima county. The rule that should control the action of the trial court upon an application for a transfer is well stated by a case cited by defendant. It is:

"Where an application for a change of place of trial is made by a defendant based upon a ground which entitles him to the change as a matter of right, the court to which it is addressed has no discretion except to grant the application. In such cases the court is ousted of jurisdiction to proceed further with the cause than to enter the order of removal." *People* v. *District Court,* 30 Colo. 123, 69 Pac. 597.

In all cases cited by the defendant as supporting his contention, the applicants for a change of place of

trial based their right upon a state of facts clearly showing that they were entitled to such change, and in each one of those cases it was very properly ruled that the trial court was without power to do other than order the transfer. When such a showing is made, he cannot rule on demurrers or allow amendments of pleadings, but must leave those questions to be passed upon by the court to which the case properly belongs. *Brady* v. *Times-Mirror,* 106 Cal. 56, 39 Pac. 209; *Nolan* v. *McDuffie,* 125 Cal. 334, 58 Pac. 4; *Woods Gold Mining Co.* v. *Royston,* 46 Colo. 191, 103 Pac. 291; *State* v. *Superior Court,* 97 Wash. 358, L. R. A. 1917F, 905, 166 Pac. 630; *South* v. *French,* 40 Cal. App. 28, 180 Pac. 357.

There is another exception to the general rule permitting defendants to be sued out of the county of their residence that seems to have had in view a state of facts similar to that disclosed in this case. It reads:

"Where the foundation of the suit is a crime, offense or trespass for which a suit in damages may lie, the suit may be brought in the county in which the crime, offense or trespass was committed, or in the county in which the defendant or any of several defendants reside or may be found." Subdivision 10, par. 394.

Texas, from which this provision (and in fact most of paragraph 394, *supra*) is taken, has treated it as applicable to a sheriff who has committed trespass against the person of another. *Lasater* v. *Waits* (Tex. Civ. App.), 67 S. W. 518; Id., 95 Tex. 553, 68 S. W. 500. The complaint being based on a joint tort alleged to have been committed by a resident of Maricopa county and two residents of Pima county, an action to recover damages therefor could properly be brought in either county under the above provision,

regardless of the county in which the trespass was committed. .

It is next contended that the court erred in overruling the demurrer of the defendant Miles on the ground that the complaint did not state a cause of action against him. It is said there is no allegation that Holloway, at the time he did the acts complained of, was in the performance of an official act as deputy sheriff, or that said acts so done were in obedience to any duty imposed by law; but, on the contrary, it appears Holloway was not engaged in the service of any lawful writ or process or in the execution of any duty or authority conferred by law, and that he acted without lawful authority in making the arrest. This proposition is unsound in so far as it attempts to question the right of a peace officer to make an arrest without a warrant. There are cases in which such officer may make arrests without a warrant, and in doing so he is in the performance of a duty imposed by law. Under the statute he has authority to make an arrest without a warrant of persons committing or attempting to commit offenses in his presence, whether the offense be a felony or a misdemeanor; of persons who have committed felonies out of his presence; of persons he has reasonable cause to believe guilty of a felony that has been committed; of persons charged, upon reasonable cause, with having committed a felony; and, at night-time, persons where there is reasonable cause to believe they have committed a felony. Section 854, Pen. Code; *Wiley* v. *State,* 19 Ariz. 346, L. R. A. 1918D, 373, 170 Pac. 869.

The complaint shows that Holloway, acting in his capacity as deputy sheriff, accused the plaintiff of having stolen a large sum of money from a man in Phoenix, and upon such accusation arrested and re-

strained her of her liberty. That he acted in his official, and not his individual capacity is made clear. It is also clear that, if the facts assumed by the officer as the basis for his action had been true, the law empowered him to arrest the plaintiff. The complaint does not show that Holloway acted, in arresting the plaintiff, without reasonable ground to believe she had committed a felony, as in the case of *Jones* v. *Van Beaber,* 164 Ky. 80, L. R. A. 1915E, 172, 174 S. W. 795, cited by defendant; or that she was guilty of no offense nor charged with any; or that she was not committing an offense in the presence of the arresting officer as in the case of *Jordan* v. *Neer,* 34 Okl. 400, 125 Pac. 1117—also relied on by the defendant. It goes into greater particularity and detail in describing the acts of Holloway and his official character than appears in the complaint in *Gomez* v. *Scanlan,* 155 Cal. 528, 102 Pac. 12, which was held good as against a general demurrer. In the last case the court said:

"The complaint in this case, however, sufficiently shows the official character of Scanlan's act. It alleges that Scanlan, acting in his capacity as constable, did arrest and imprison the plaintiff, Magdalena Gomez, on a pretended charge of grand larceny. On such charge, one of felony, he had authority, as a peace officer, to make an arrest without a warrant. Pen. Code § 836."

Our section 854, *supra,* giving peace officers the authority to make arrests without a warrant, is the same as section 836 of the Penal Code of California.

The statute makes the sheriff in all respects responsible for the official acts of his deputy. Paragraph 2538, Civ. Code. It is necessary, therefore, in an action against the sheriff, as such, for damages for a false imprisonment by his deputy, that the complaint show by proper allegations that the deputy's act was an official act. The courts do not agree as to

what acts of a deputy sheriff or constable are official acts for which the principal officer is liable under the law. Our examination of the cases, however, convinces us that the correct rule is stated in *Turner* v. *Sisson,* 137 Mass. 191, wherein the court defines an official act as follows:

"It means any act done by the officer in his official capacity under color and by virtue of his office."

The court, in the case of *Hall* v. *Tierney,* 89 Minn. 407, 95 N. W. 219, approves the Massachusetts definition of an "official act" and adds:

"The distinction originally made between acts done by virtue of an office and acts done by color of office has been entirely disregarded by leading authorities within the past few years [citing authorities]. . . . Under G. S. 1894, § 7120, the right is given the sheriff to arrest a person without a warrant, and it has been held in this state that, whether a sheriff arrests under a warrant or under the authority thus given by statute (that is, without a warrant), he acts in his official capacity. *Warner* v. *Grace,* 14 Minn. 487. As a peace officer, the sheriff arrested and incarcerated the plaintiff in jail. He made this arrest without a warrant, and in so doing acted officially, and, it is alleged without authority of law."

Quoting and adopting the definition of an "official act" in the Turner-Sisson case, the Supreme Court of Illinois made this comment:

"By an official act is not meant a lawful act of the officer in the service of process; if so, the sureties would never be responsible. It means any act done by the officer in his official capacity, under color and by virtue of his office." *Greenberg* v. *People,* 225 Ill. 174, 8 L. R. A. (N. S.) 1223, 116 Am. St. Rep. 127, 80 N. E. 100.

Our court, in at least two decisions, appears to sanction and adopt the above definition of an "official act." In *Wilson* v. *Lowry,* 5 Ariz. 335, 52 Pac.

777, it is held that a sheriff who seizes exempt property under execution, and refuses to release it upon demand, acts unlawfully, but under color and by virtue of his office constituting a breach of his official bond.

In *Gray* v. *Noonan,* 5 Ariz. 167, 50 Pac. 116, it is said a sheriff's sureties are liable for acts of sheriff committed under color and by virtue of his office.

In a very recent case, *Reichman* v. *Harris,* 252 Fed. 371, loc. cit. 384, 164 C. C. A. 295, 308, the court said:

"Where the act of the deputy is an official act and causes an injury, the sheriff is answerable; and this is true where the act is done in execution of the deputy's office, even though he may be mistaken as to the lawfulness of the act, for otherwise no action could ever be maintained against a sheriff for the misconduct of his deputy [citing cases]. Although the sureties of the sheriff are not parties here, yet the controlling principles laid down in these cases and by Judge COOLEY are necessarily involved and applied in decisions granting recovery against a sheriff or other like officer and his sureties for misconduct of the officer or his deputies [citing authorities]."

Also in *Meek* v. *Tilghman et al.,* 55 Okl. 208, 154 Pac. 1190, the court said:

"In *Brown* v. *Weaver,* 76 Miss. 7, 71 Am. St. Rep. 512, 42 L. R. A. 423, 23 South. 388, in a well-considered opinion the court quotes from Murfree on Sheriffs as follows:

" 'If the act from which the injury resulted was an official act, the authorities are clear that the sheriff is answerable; if it was not an official, but a personal, act, it is equally clear that he is not answerable. But an official act does not mean what the deputy might lawfully do in the execution of his office; if so, no action would ever lie against the sheriff for the misconduct of his deputy. It means, therefore, whatever is done under color or by virtue of his office.' "

We think the more modern view taken by most of the courts is well expressed by Mr. Justice CHAD-WICK in *Greenius* v. *American Surety Co.,* 92 Wash. 401, L. R. A. 1917F, 1134, 159 Pac. 384, as follows:

"Much mental energy has been expended in drawing distinctions between acts of public officers done *colore officii* and acts done *virtute officii,* and we shall not undertake to assemble definitions. Our understanding is that, when an officer acts in the performance of his duty and, so acting, acts to the hurt or annoyance of a third party or an innocent party, he is nevertheless acting in virtue of his office. That is to say, if his office gives him authority to act, he is acting in virtue of his office, although, in the performance of a specific duty, he improperly exercises his authority. For instance, if an officer have a warrant for A. and, without reasonable ground for believing him to be the guilty person, takes B., he is still acting in virtue of his office. If it were not so, he would never be liable upon his bond. Nor would his surety ever be liable except for his lawful acts, which is *reductio ad absurdum,* for it follows that there could be no liability if there had been no breach of duty."

The law being that a peace officer may not make an arrest for a misdemeanor committed or attempted out of his presence without a warrant, the complaint doubtless should have been more definite and certain in stating the grade of the offense with which plaintiff was charged at the time he arrested her. If he arrested her for a misdemeanor, it would not be an official act for which his principal would be liable, and a complaint showing such a state of facts would be demurrable. But the complaint here alleges that Holloway arrested plaintiff on a charge of having stolen "a large sum of money." This allegation was not specifically objected to either by demurrer or motion to make more definite and certain. We therefore conclude it was sufficient to admit evidence that the

character and grade of the offense intended to be charged was a felony and, as against a general demurrer was good.

The defendant Miles demurred to the complaint on the ground that there was a misjoinder of actions, in that a cause of action *ex delicto* against Miles is joined with an action *ex contractu* against his surety; and for the further reason that there was a misjoinder of parties defendant. The overruling of this demurrer is assigned as error.

Our sections 197, 198, and 199, Civil Code, as to the obligations of an official bond and right of action thereunder, were taken from the California Political Code, and correspond to its sections 959, 960, and 961.

In *Van Pelt* v. *Littler,* 14 Cal. 194, loc. cit. 196, the same being a case against a constable and his sureties for a breach of the official bond of the constable, the court said:

"The bond is a contract by which the officer and his sureties, in effect, covenant and agree, not only that the officer will faithfully perform the duties enjoined by law, but that he will not by virtue, or under color, of his office, commit any illegal or improper act. The obligation imposed by the contract, and the liability resulting from a violation of its terms, are in all cases primary and absolute, and the remedy is the same whether the cause of action results from nonfeasance or the misfeasance of the officer. It is no answer to an action upon the official bond of an officer that the party complaining has not chosen to pursue some other equally available and proper remedy."

See, also, *Doeg* v. *Cook,* 126 Cal. 218, 77 Am. St. Rep. 171, 58 Pac. 707; *Felonicher* v. *Stingley,* 142 Cal. 632, 76 Pac. 504; *Sam Yuen* v. *McMann,* 99 Cal. 499, 34 Pac. 80; *Bell* v. *Peck,* 104 Cal. 35, 37 Pac. 766; *Kane* v. *Union Pacific R. R. Co.,* 5 Neb. 107; *Gray* v. *Noonan,* 5 Ariz. 167, 50 Pac. 116; Id., 6 Ariz. 36, 53

Pac. 7; *Wilson* v. *Lowry,* 5 Ariz. 335, 52 Pac. 777; *Stark County* v. *Mischel,* 33 N. D. 432, 156 N. W. 931.

Paragraph 427, Civil Code, which prohibits the joining of actions *ex contractu* with actions *ex delicto,* was the law of the state at the time the decisions were rendered in the Gray-Noonan and the Wilson-Lowry cases; and its provisions evidently were not thought to be applicable to an action upon an official bond against the principal and sureties for a breach thereof, as no reference is therein made to paragraph 427.

It is next contended that the court erred in overruling defendant Miles' motion for an instructed verdict. By an examination of the abstract of the testimony, we find that such a motion was made, predicated upon two grounds: First, "that [plaintiff] having failed to prove a cause of action against the Maryland Casualty Company at all, there remains in this court only against two public officers of Pima county who have filed their application for a transfer and that this court has no jurisdiction to try this case"; and, second, the facts proved show, if they show anything, a personal trespass by George Holloway.

At the same time defendant Montgomery asked an instructed verdict for a failure of evidence showing any liability as against him or his surety. Both these motions were overruled by the court.

The first part of defendant Miles' motion is unintelligible, or at least is not based upon the state of the record as it then existed. The case had not been dismissed as to any of the defendants at that time. It was, as a matter of fact, submitted to the jury to pass upon the liability of all the defendants. Treating the assignment, however, as sufficient to present the question of the character of Holloway's act, whether official or individual, we cannot help but

suggest that neither counsel for plaintiff nor defendant has gone to the trouble or pains to assemble the facts bearing upon that question. They have left it to the court to search through the abstract of the record for the evidence upon that question.

Briefly, the evidence is that on March 1st, about 1:30 A. M., defendant Montgomery telephoned the sheriff's office of Pima county at Tucson to arrest and wire at his expense Nannie Fitzpatrick, *alias* Nannie Jones, *alias* Nannie Sibley, stating that she had stolen $2,700, describing her as "about 125 pounds, 5 feet, red hair, blue eyes, light complexioned, gold tooth upper left jaw, scar above eyes," together with a description of the money as "fifty 20 dollar bills, one 1,000 dollar Liberty Bond, fourth issue, one 500 dollar Liberty Bond, fourth issue, two 100 dollar Liberty Bonds, fourth issue."

This telephonic message was received at the sheriff's office of Pima county by the night jailer, who thereupon gave the matter over to the defendant Holloway as deputy sheriff. Holloway entered the train at Tucson and shortly thereafter, while the train was proceeding eastward, compelled the plaintiff to get out of her berth, she having retired for the night, dress, and later leave the train with him at Benson. He did not find any of the property described as stolen in her possession. Plaintiff told him that her name was Helen Wright, showed him a telegram addressed to her in that name, and her marriage license, and declared her innocence. When asked by her if he had a warrant for her arrest, he exhibited his deputy sheriff's badge as his authority to arrest her. He told her that he was arresting her for stealing money and Liberty Bonds from some old man; said he had orders to arrest Nina Wagner; told plaintiff that her name was not Helen Wright, that she was going under two assumed names, one being Pat-

terson. He held her at Benson until he received a
phone message from the sheriff's office at Phoenix,
via the sheriff's office at Tucson, to release her.

The night jailer at Tucson, who was also a deputy
sheriff, testified he put Holloway on the job, called
Holloway to look up the person described in the tele-
phonic message from the sheriff of Maricopa county.
He said:

"I had been informed by Miles [sheriff] and the
undersheriff if there is anything reported there. I
could not leave—I was jailer—to call the deputies."

It was shown from the evidence that it was the
habit of Holloway to make arrests without a warrant,
and that this was done on telephonic messages from
sheriffs of other counties without instructions from
the sheriff whose deputy he was.

The authorities heretofore cited upon the sufficiency
of the complaint are also authority that the above
stated evidence, when considered upon a motion for
an instructed verdict, is ample to take the case to the
jury. This is especially true when it is considered
that defendant did not, either by his answer or at
the trial, attempt to justify or excuse the arrest of
plaintiff upon the ground that Holloway had reason-
able cause to believe her to be the person charged
with grand larceny.

It is argued that this evidence fails to show that
Miles had any knowledge of the telephone message
received at his office from the sheriff of Maricopa
county, and that he knew nothing of the whole trans-
action, including the arrest, until after it had taken
place, and is therefore not liable. In the first place,
we think the law is that the sheriff is responsible for
all acts of his deputy done under color and by virtue
of his office, regardless of the sheriff's lack of pre-
vious knowledge that such act is about to be per-

formed. This seems to be the statutory rule, which states:

"The sheriff may appoint one or more deputies, for whose official acts he shall be in all respects responsible." Paragraph 2538, Civ. Code.

This is also the judicial determination.

In *Hereford* v. *Brentz,* 192 Ala. 465, 68 South. 350 it is said:

"The general deputy, like the sheriff, is a peace officer and has the same authority to arrest, with or without warrants; and if the deputy, while acting as such, commits a tort or trespass upon another, for which he would be liable, his chief would also be liable in the same degree and to the same extent, civilly, as the deputy himself." *Rogers* v. *Carroll,* 111 Ala. 610, 20 South. 602; *Kittredge* v. *Frothingham,* 114 Me. 537, 96 Atl. 1063.

In *Kusah* v. *McCorkle,* 100 Wash. 318, L. R. A. 1918C, 1158, 170 Pac. 1023, the court said:

"The sheriff, being responsible for reasonable care in the selection of his deputies, is responsible also for the negligence of a deputy in the performance of his duty as such."

In the second place, it appears that no rules or regulations of the sheriff's office attempted to limit Holloway's authority to make arrests without warrant; but, on the contrary, it was the custom or habit for deputies to act upon telephonic messages as Holloway did in this case. In such case the law would infer previous knowledge by the sheriff if it were necessary.

Finally, it is contended the court erred in overruling defendant Miles' objection to the testimony of plaintiff as to the whereabouts and occupation of her husband. It was in evidence that plaintiff was married, and we think she had a right to account for his absence at the trial and, in doing so, could state

where he was and what he was doing. The sting in plaintiff's answer was that "he was with Uncle Sam's service" in France. The court permitted the testimony to stand as against a motion to strike, stating in the presence of the jury that the service in which plaintiff's husband was engaged was immaterial and incompetent to determine whether or not there was anything due plaintiff in the case. We think from this statement of the court the jury must have fully understood the limited purpose for which such testimony was admitted, and the defendant Miles was not prejudiced thereby.

The judgment is affirmed.

CUNNINGHAM, C. J., and BAKER, J., concur.