PARAMORE *v.* THE STATE.

1. The defendant's statement before the jury showed that he invited the officer's search of his person for liquor. In these circumstances the search was not unlawful and would furnish no ground for holding the arrest unlawful. It is not necessary to decide whether an arrest without a warrant, after intoxicating liquor has been found on the person arrested, would be unlawful merely because the discovery was the result of an illegal search. The facts of the case are not such as to authorize application of the principle ruled in *Pickett* v. *State,* 99 *Ga.* 12 (25 S. E. 608, 59 Am. St. R. 226), recently cited with approval in *Douglas* v. *State,* 152 *Ga.* 379, 391 (110 S. E. 168).

2. Where a person after being arrested on a charge of misdemeanor flees in an effort to escape, it is unlawful for the arresting officer, after calling upon him to halt, to shoot at such fleeing offender with a pistol, merely to prevent his escape. Where the officer shoots at the prisoner in the circumstances just stated, the unlawful act of shooting may or may not, according to the circumstances of the case, afford ground for mitigation or justification of a homicide committed by the escaping prisoner in killing the officer. Under application of the above ruling it was erroneous to charge the jury: "If you believe from all of the evidence that Jeff Williams, the deceased, was a police officer in Iron City, that the defendant was violating the prohibition law by having whisky in the presence of the deceased, that he arrested the defendant and the defendant broke and ran, that the deceased shot at the defendant several times after commanding the defendant to stop, and the defendant shot the deceased while the officer was seeking to arrest him without force, then, if you find this to be the truth of the case, you will be authorized to find the defendant guilty of murder."

3. The charge excepted to in the 9th ground of the amended motion for new trial is not open to the criticism that it left "the jury to believe that the doctrine of reasonable fears as enunciated in said Code section 71 applied to the law of manslaughter, and that said charge was confusing and misleading and was likely to impress the jury that the doc-

trine of reasonable fears as applied to the case at bar did apply to the law of manslaughter."

4. The judge charged: "The State has brought to you such testimony and physical facts by which it is contended that the defendant has committed the crime or offense of murder. The State has produced before you a witness who has testified as to certain statements made to him by the defendant. It is claimed by the State that these alleged statements are such as to incriminate the defendant. The court charges you, in connection with this testimony of the witness, Alex Williams, that the defendant is entitled to have the entire conversation alleged to have taken place submitted to you for your consideration. However, you have the right to believe all of said alleged admissions, or you may believe a part of it and reject a part, or you may reject the whole of it." *Held*, that this charge was not erroneous because, as contended, (a) It expressed an opinion upon the facts in the case, (b) that the alleged omissions were accompanied by an explanation which would negative malice and show justification in firing the fatal shot, (c) that the testimony was necessary to prove the corpus delicti, and being so, the jury must receive the whole statement as made and accept it as true or reject the whole statement.

5. The court charged: "Whether the arrest was legal or illegal, gentle-men, I charge you that if you should find from the evidence that at the time the deceased was shot he [had] hold of the defendant, and that the deceased was loading his pistol, and that he said to the defendant that 'When I get my pistol loaded, I am going to kill you,' and the defendant believed that his life was in danger and the defendant shot the deceased in self-defense, then I charge you that it would be your duty to acquit the defendant." *Held*, that this was a concrete charge of one of the defendant's contentions, and, properly construed, was not erroneous, as contended, on the grounds, (a) that the judge should have defined "legal arrest;" (b) that the charge confined the ground of justification to belief that his life was in danger, whereas justification might be based on a reasonable fear that a felony less than the taking of life was about to be committed upon him; (c) that it restricted the right of the defendant to resist an illegal search or illegal arrest; that it instructed the jury that the defendant would not have been justified in shooting the deceased unless he believed that his life was in danger even though the defendant acted under the fears of a reasonable man and shot to prevent a felony from being committed upon him.

6. The judge charged the jury that there is no presumption of guilt, but on the contrary the defendant is clothed with the presumption of innocence which "remains with him throughout the trial until overcome by evidence to your satisfaction beyond a reasonable doubt." Also: "I charge you that a reasonable doubt is a doubt for which you can give a reason. You will have no right to create in your mind a vague or fanciful doubt, in order to acquit the defendant; but the doubt must be one reasonably entertained by you arising from evidence, or the lack of evidence, or the statement of the defendant, which leaves your minds wavering, not satisfied." Also: "If you are not satisfied with evidence of the State as to his built, or if you have a reasonable doubt resting upon your mind as to his guilt, it would be your duty to acquit him."

*Held,* that if more elaborate instruction to the jury on the subject of reasonable doubt had been desired, there should have been appropriate written requests.

7. After charging Penal Code §§ 64, 65, and 66, relating to the law of voluntary manslaughter, and § 70, relating to the law of justifiable homicide, the judge charged § 71, as follows: "A bare fear of any of those offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge." *Held,* that if further instructions were desired, relating to the doctrine of reasonable fears as applicable to the case, there should have been appropriate written requests.

8. Where conviction of a crime does not depend entirely on circumstantial evidence, the omission, in the absence of an appropriate written request, to charge the law of circumstantial evidence is not cause for reversal. *McElroy* v. *State,* 125 *Ga.* 37 (53 S. E. 759); *Smith* v. *State,* 125 *Ga.* 296 (54 S. E. 127). In view of the evidence as to admissions by the defendant that he shot the officer, and other evidence as to the character of the wound, the death of the officer, and the manner in which the shooting occurred, it was not erroneous in this case to omit to charge the law of circumstantial evidence, without an appropriate request.

9. There are numerous grounds of the motion for new trial, complaining of the omission of the judge to give specified charges without any request having been made therefor. Some of them would not have been properly adjusted to the facts of the case; some of them are dealt with in the previous divisions. In so far as any of them stated correct principles of law applicable to the case, they were insufficient to show error, when considered in the light of the entire charge to the jury.

10. As the judgment of the trial court will be reversed upon error contained in the charge excepted to in the 8th and 11th grounds of the motion for new trial, it becomes unnecessary to deal with the general grounds complaining that the evidence was insufficient to support the verdict, and that the verdict was contrary to law.

No. 4563.   SEPTEMBER 29, 1925.

Murder. Before Judge Custer. Seminole superior court. September 27, 1924.

Silas Paramore was convicted and sentenced to be hanged for the murder of I. J. Williams. His motion for a new trial was overruled, and he excepted. The State's evidence was substantially as follows. Williams was a policeman in the town of Iron City in Seminole County. After midnight on a stated Saturday, Paramore (with whom were several others including his son, C. Wright Paramore, and Jim Richardson) drove his automobile into town and stopped at a point south of and a short distance from the depot. The officer (the person slain) and several others approached the

car. There was odor of whisky. The officer arrested Richardson and Paramore, without a warrant, on the ground that they had whisky in their possession. Paramore was searched, and a quart bottle containing some whisky was found on his person. The officer took him in charge, and delivered Richardson over to certain persons who were called into service for the purpose of carrying him to jail. At the request of Paramore the officer went with him a short distance to call C. Wright Paramore. The latter failed to respond, and they returned to the automobile. In the meantime Jim Richardson escaped and disappeared, going in a southerly direction from the car, that being an opposite direction from the depot. Paramore requested the officer to allow him to get his automobile key out of the automobile. His request was granted. He approached the car on the opposite side from where the officer was standing and reached in and took something out. (The witness who stood nearest to him testified that the thing taken was from the "tool-chest," and consisted of a package about five inches long wrapped in a cloth.) He then fled, going in a northerly direction towards the depot. The officer ran in pursuit, gaining upon him and calling upon him to stop, and shooting his pistol twice. (Some of the witnesses testified that the shots were fired in the air, and others that they were fired down on the ground.) The prisoner was heard to respond that he would stop if the officer would stop. They disappeared around the corner of the depot. Some three other shots were heard after they had disappeared. A witness who resided beyond the depot heard the shooting and ran to his porch, and saw one man running away from where the last shots were fired. Nothing more was seen of Paramore until he was found in New Jersey about six months later, living under an assumed name. Immediately after the shooting a search was made for the officer, and some time after (estimated to be from one half to one and a half hours) his body was found a short distance from the depot, lying face downward, with a pistol grasped in the right hand, and the head lying in the direction of the automobile. About 60 or 70 yards from where the body was found there were tracks of men, indicating that "a scuffle" had taken place. About 20 yards from the body spots of blood were found on the ground, and other spots of blood marked a trail from that point to the body. The body was pierced by a bullet that entered the back near the right shoulder

blade and came out below the left nipple. There were four empty shells in the officer's pistol. The coat worn by the officer was powder-burned at the place where the ball entered. Paramore was discovered in New Jersey by detective agencies. He denied his identity until confronted with his son, C. Wright Paramore, who gave answers to questions that caused him to admit his identity.

Alex. Williams, the detective who discovered Paramore, came from New Jersey and testified at the trial as to statements made by the defendant, Silas Paramore, to him, in part as follows: "I killed Jeff Williams. . . I was going from a party below Iron City, . . and we stopped in Iron City. The fellow that was with me was named Jim Richardson; he was drunk, and I stopped my car . . to get some gas, and . . Jim Richardson began to heave out of the car, . . and Jeff Williams come up . . and arrested Jim Richardson and turned him over to another man, . . and he said, 'Hold this man while I search Silas; I believe he has got some whisky;' and he come and searched me and found a half pint of whisky on me; then he said, 'Well, Silas, I will have to arrest you because you are selling whisky,' and started to take me to the guard-house. Then I said, 'Mr. Williams, I have got to get a package in my car I want to give to my boy to send to my wife . . ,' and Mr. Williams said, 'All right, go and get it.'" He said that he goes to get his package out of the car and to get his key to lock his machine, . . and looked in the tool-box and got his machine key and pistol . . and wheeled and broke to run, and Jeff Williams broke to run after him, and begun shooting and shot until he shot out and overtook him and caught him in the back of the coat, . . and . . said to him, "Hold on, I have got you, you ———, and I am going to kill you," and "he . . was trying to hold me and load his pistol at the same time; . . he [Silas] had his pistol in his inside coat pocket," and . . when Jeff Williams was trying to hold him and load his pistol he reached and got his pistol out and throwed it upon him like that, and shot one time, and . . Jeff Williams fell and said, "Silas, you have shot me; don't shoot me any more, and I will let you go," and . . he run off up the railroad to his brother Jim's.

The defendant did not offer any evidence, but made a statement before the jury, in the course of which, after describing the search of his car and the arrest of Jim Richardson, he declared that the

officer said: "Silas, I want to search you," and "I said, 'All right, sir,' and I shoved my hands down, and he walked up to me and searched me, . . and said, 'You have got nothing on you,' and about that time . . the negro [Jim Richardson] had snatched aloose, . . and we heard [him] running, . . and he [Williams] tore off behind him and . . run behind Jim Richardson to about King's shop, and turned around and come back to the car. . . I was standing right there where he had left me. . . Mr. Williams had a pistol in his hand. . . When he walked to the car . . he turned and looked at me and said, 'Silas, you can go on home; you have got nothing.' . . I stooped down to crank up the car, . . and that bottle I had in my bosom turned some, and I made a grab at it, and this boy he had sent to arrest this other man saw me make the awkward move, and he said, 'Search him again; he has got something in his bosom,' and Mr. Jeff [Williams] said, 'Wait a minute, Silas, what is that in your bosom?' [I said] 'You are the man to see; come and search me,' and he come and reached his hand in and unbottoned my shirt about here, and pulled the bottle out and held it up and said, 'What is this in this bottle?' and I said, 'I bought it for whisky, but I have not drank any of it,' and that I did not intend to drink any until I got home, because I was driving the car, . . and he turned to me and said, 'Silas, I am going to put you in the calaboose . .' and I said, 'All right, but I want to call my son to take the car to his mother and to tell them . . to come . . in the morning and get me out,' and Mr. Jeff said, 'All right,' and I called my son C. Wright, and he would not answer. . . I turned around and walked about two steps, and my son was up the road and I said, ' C. Wright,' and he said, ' Sir,' and I said, ' Come back here and take this car home, because Mr. Jeff Williams is . . going to put me in the calaboose for finding whisky on me,' . . and he said, 'I am not going to do it; I am not coming back.' Mr. Williams said, 'I will take care of the car and put it up;' and when he said that, them other two boys . . went off and had a few words, I don't know what they said, . . and Mr. Williams turned around and said, 'I am a good mind to kill you,' and had his pistol in his hand, and I jumped to run, and my hat fell off, . . and I was going to the depot, and I run around the depot, and these two boys said, 'Head him off, head him off,' and Mr.

Williams was shooting behind me and said, 'Stop; if you don't I will kill you, Silas.'᠁ Every time he would shoot he would say, 'Stop; if you don't I will kill you,' and these boys went around back of the depot, and as I went around the depot these boys come around the depot, and they were shooting behind me, and I run, and some of them said, 'You can go, but I will get you in the morning.' I went on across the railroad and got into the dirt road and went home. . . I don't know anything much about that Alex. Williams' [the State's witness from New Jersey] testimony. I didn't know him, only he said his name was Alex. Williams. When I met him in New Brunswick, N. J., one Thursday evening, he said his name was Alex. Williams, . . and he said, . . 'It seems to me I have seen you before,' and I said, 'I don't know, I don't remember seeing you before,' . . and he said, 'What is your name?' and I told him Silas Paramore, and he said, 'I have heard a lot of talk of you,' and I said 'What have you heard?' and he said, 'I heard that there was a reward for you at Iron City, Georgia; are you the man . . do you know anything about that?' and I said, 'About what?' and he said, 'About that reward, and that you were wanted down there, charged with murder,' . . and I said, 'I am not the man,' that I did not leave there because I was accused of having shot anybody, that I had not shot anybody. I said, 'I left Seminole County because I was criminated something about whisky that the marshal and three white men charged me with. That is all that I can tell you about that.' That is all that I said to Alex. Williams."

Jim Richardson testified that he kept running when he escaped after arrest, and "was running when the shooting occurred. . . I wasn't far from home (nearly a mile) when I heard the shooting."

The motion for new trial consisted of the usual general grounds and certain special grounds which are shown by the headnotes and the opinion of the court.

*H. G. Rawls, C. A. Drake, J. A. Drake, R. D. Welch,* and *W. I. Geer,* for plaintiff in error.

*George M. Napier,* attorney-general, *B. T. Castellow,* solicitor-general, *T. R. Gress,* assistant attorney-general, *R. R. Arnold* and *E. C. Hill,* contra.

ATKINSON, J. 1. The ruling announced in the first headnote does not require elaboration.

2. The eighth and eleventh grounds of the motion for new trial complain of the charge which is quoted in the second headnote. Numerous exceptions were taken to this portion of the charge. In 2 R. C. L. 473, § 30, it is said: "As a general rule, in the case of a misdemeanor an officer has no right, except in self-defense, to kill the offender, either in attempting to make an arrest, or in preventing his escape after arrest." See also 5 C. J. 426, § 62. In Holland v. State, 162 Ala. 5, 13 (50 So. 215), it was said: "While an officer having a warrant of arrest is justifiable in killing one charged with a felony, if he resist or flees, this rule does not prevail as to arrest of persons charged with misdemeanors. 'When an attempted arrest is for an ordinary misdemeanor or in a civil action, life can only be taken by the officer where the person arrested resists by force, and so endangers the life or person of the officer as to make such killing necessary in self-defense.' Kerr on Homicide, 187; Birt v. State, 156 Ala. 29, 46 South. 858; Clements v. State, 50 Ala. 117." In Rawlings v. Commonwealth, 191 Ky. 401, 405 (230 S. W. 529), it was said: "The law is that an officer in arresting a misdemeanant has no right to shoot, wound, or kill him solely for the purpose of effecting his arrest, or to prevent his escape. Stevens v. Commonwealth, 124 Ky. 32; Reed v. Commonwealth, 125 Ky. 126; Smith v. Commonwealth, 176 Ky. 466, and Hickey v. Commonwealth, 185 Ky. 570." See also Terrell v. Commonwealth, 194 Ky. 608 (240 S. W. 81). In *Croom* v. *State,* 85 *Ga.* 718, 725 (11 S. E. 1035, 21 Am. St. R. 179), this court said, by way of argument: "Hamlin [a bailiff] had shortly before that time killed a negro unlawfully; for he could not lawfully kill him merely because he ran from him to avoid arrest for a misdemeanor." See also *Holmes* v. *State,* 5 *Ga. App.* 166 (2) (62 S. E. 716).

The case of People v. Klein, 305 Ill. 141, 146 (137 N. E. 145), involved a homicide committed by a deputy sheriff by shooting a person in an automobile. The officer fired the shot after the automobile had passed him on the road and the driver had failed to respond to the officer's command to stop. It was said in the opinion: "Even though it were to be conceded that the evidence shows that the shooting was not done in reckless disregard of human life but in an attempt on the part of the accused to make an arrest, there was no justification for his firing his gun for such purpose. The offense, if one was being committed by the deceased

and his companions, was but a misdemeanor. An officer, generally, may use a deadly weapon, even to the extent of taking life, if necessary to effect the arrest of a felon, for the reason that the safety of the public is endangered while such felon is at large; but the rule, by the great weight of authority both in this country and in England, is, that except in self-defense an officer may not use a deadly weapon or take life to effect an arrest for a misdemeanor, whether his purpose is to kill or merely to stop the other's flight. This is true, even though the offender can not be taken otherwise. State *v.* Smith, 127 Iowa, 534; State *v.* Sigman, 106 N. C. 728; Conraddy *v.* People, 5 Park. Crim. (N. Y.) 234; Commonwealth *v.* Loughhead, 218 Pa. 429; Forster's case, 1 Lew C. C. (Eng.) 187; 5 Corpus Juris, 426; Wharton on Homicide (3d ed.), sec. 500." The case of Coldeen *v.* Reid, 107 Wash. 508 (182 Pac. 599), was another instance of an officer shooting a pistol into an automobile which proceeded after the driver was ordered by the officer to halt. It was said: "In attempting to make an arrest for a misdemeanor, police officers have no warrant to maim or kill a person who attempts to escape." The case of People *v.* Lathrop, 49 Cal. App. 63, 70 (192 Pac. 722), involved the crime of assault with intent to commit murder, made by an officer by shooting a gun on the ground about six or eight feet behind an automobile which the driver had refused to stop after being commanded to do so by the officer. The court said: "There was no pretense of any resistance on the part of Soares, or that defendant was in any danger of violence, and the mere fact that Soares had committed a misdemeanor and was attempting to escape did not warrant the defendant in thus recklessly exposing Soares to such injury. The humanity of the law requires rather that the fugitive should have been permitted to escape for the time being. There was nothing so urgent about the case as to demand the drastic course pursued by the defendant. Other effective and less dangerous means were open to him."

Harding *v.* State (Arizona), 225 Pac. 482, was a case where an officer in attempting to arrest a driver shot at a tire to disable the automobile, and killed the driver. It was held that even though the killing was unintentional, the act of shooting being unlawful, the officer committed the offense of involuntary manslaughter. It was said in the opinion: "Under section 854 of the Penal Code,

a peace officer is authorized, either with or without a warrant, to make arrests of persons committing, or attempting to commit, a public offense in his presence.. Since the deceased was, at the time appellant shot him, actually committing a misdemeanor, the appellant under the law had a right to arrest him; but the question is, did he, under the facts, have a right to shoot him? It must be admitted that there is a wide difference between the right to arrest a misdemeanant and to kill him. In Wiley v. State, 19 Ariz. 346, 170 Pac. 869, L. R. A. 1918D, 373, we quoted with approval, from Petrie v. Cartwright, 114 Ky. 103, 70 S. W. 297, 59 L. R. A. 720, 102 Am. St. Rep. 274, the following language: 'The notion that a peace officer may in all cases shoot one who flees from him when about to be arrested is unfounded. Officers have no such power, except in cases of felony, and there as a last resort, after all other means have failed. It is never allowed where the offense is only a misdemeanor.' This is practically the universal rule. 5 C. J. 426, section 62, states it thus: 'Except in self-defense, an officer has no right to proceed to the extremity of shedding blood in arresting, or in preventing the escape of one whom he has arrested, for an offense less than felony, even though the offender can not be taken otherwise, a distinction being recognized in this respect between arrests for misdemeanors and arrests for felonies.' In State v. Sigman, 106 N. C. 728, 11 S. E. 520, it is said: 'An officer who kills a person charged with a misdemeanor, while fleeing from him, is guilty of manslaughter, at least.' The reason for limiting the powers of a peace officer in making an arrest of a person committing, or attempting to commit, a public offense of the grade of misdemeanor in his presence is that organized society will suffer less by the temporary escape of such person than it would if the officer should be permitted to take his life, or inflict upon him great bodily harm, to prevent his escape. Most of the acts graded as misdemeanors have no element of moral turpitude, and are offenses simply because the public policy, through the lawmaking body, has so decreed. But even when the act is malum in se, and is graded as a misdemeanor, it is not thought to deserve death at the hands of an arresting officer simply because the offender seeks to avoid arrest by running away. When the offense is bad simply because prohibited, much less should the officer assume to take the offender's life if he disregards orders, and fails to stop when com-

manded to do so, but keeps on going. Persons charged with petty
offenses do not usually run very far nor hide out very long; and if
they do not later seek the officer and surrender to him, it is ordi-
narily easy enough for the officer to find them and arrest them
without bloodshed. But, whether such offenders are ever arrested
or not, no peace officer has any right to shoot them because they do
not halt when told to do so—'the theory of the law being that it
is better than a misdemeanant escape than that human life be
taken.' United States *v.* Clark (C. C.) 31 Fed. 710. In Thomas
*v.* Kinkead, 55 Ark. 502, 18 S. W. 854, 15 L. R. A. 558, 29 Am.
St. Rep. 68, the court was considering the power of a peace officer
to rearrest an escaped misdemeanant, and concluded that it was
the same and no greater than in making an original arrest. In
arguing the question, the court used this very pertinent language:
'And it would ill become the "majesty" of the law to sacrifice a
human life to avoid a failure of justice, in the case of a petty
offender who is often brought into court without arrest, and dis-
missed with a nominal fine. It is admitted that an officer can not
lawfully kill one who merely flees to avoid arrest for a misde-
meanor, although it may appear that he can never be taken other-
wise. If he runs, then, before the officer has laid his hands upon
him with words of arrest, he may do so without danger to his life.'
See, also, 1 Michie on Homicide, p. 257, § 72."

One of the rulings made in State *v.* Sigman, 106 N. C. 728 (11
S. E. 520), was: "Where a person charged with a misdemeanor
escaped from the custody of an officer, and was fleeing to avoid a
rearrest, and the officer, being unable to overtake him, threatened
to shoot, and, the fugitive not stopping, did fire his pistol when
within thirty yards: *Held,* that the officer was guilty of an assault,
no matter whether his intention was to hit the person so fleeing or
simply to intimidate him and thereby induce him to surrender."
It is stated in the text in Wharton on Homicide (3d ed.), 748,
§ 500: "An officer may not exert force in effecting an arrest for
a misdemeanor, or in preventing escape or rescue after such arrest,
to the extent of employing a deadly weapon, or of taking life,
though without such force the wrong-doer may escape. And this
is so whether his purpose was to kill or merely to stop the other's
flight."

In the instant case the offense for which the defendant was

arrested (the offense of having intoxicating liquors in his possession) was a misdemeanor. Under application of the foregoing principles it would have been unlawful for the officer to shoot *at him* with a pistol, while he was fleeing, merely to prevent his escape. A different question would have been presented if the arrest had been for a felony. As to the duty and authority of a penitentiary guard in relation to a felony convict endeavoring to escape, see *Jackson* v. *State,* 76 *Ga.* 473. Where an officer unlawfully *shoots at* a fleeing offender, such unlawful act may or may not, according to the circumstances of the particular case, amount to an assault or a more serious offense, and may afford grounds of mitigation or even justification of the killing of the officer by such fleeing defendant. The unlawfulness of the act of shooting at the person would bring the case within the principle of *Norton* v. *State,* 137 *Ga.* 842 (3) (74 S. E. 759), where it was held: "One upon whom an arrest unlawfully and without a warrant is attempted to be made has a right to resist force with force proportionate to that being used in detaining him. The mere fact of unlawful arrest will not alone authorize the killing of the officer making it. But if, in the progress of the transaction, the officer is about to commit a felony upon the other party, or so acts and makes such a show of violence as to excite in the person sought to be arrested the fears of a reasonable man that a felony is about to be committed upon him, and such person acts under the influence of those fears and not in a spirit of revenge, he may protect himself, although it may be necessary to slay the officer for that purpose. In some cases, where the circumstances are not such as to justify the killing of the officer, they may be sufficient to reduce the homicide from murder to manslaughter. *Franklin* v. *Amerson,* 118 *Ga.* 860, 863 (45 S. E. 698); *Thomas* v. *State,* 91 *Ga.* 204 (18 S. E. 305); *Perdue* v. *State,* 135 *Ga.* 277, 284 (69 S. E. 184); *Porter* v. *State,* 124 *Ga.* 297 (52 S. E. 283, 2 L. R. A. (N. S.) 730)." See also *Pickett* v. *State,* 99 *Ga.* 12 (2) (supra). The charge quoted above was opposed to the principles here announced, and deprived the defendant of all right to insist upon mitigation or justification of the homicide on the ground that the act of the officer in shooting at him was unlawful. The charge was erroneous and requires the grant of a new trial.

3. The 9th ground of the motion for new trial was as follows:

"Because the court erred, after having given to the jury definition of murder and express and implied malice and informing the jury of the penalty in case the person tried was convicted of murder, in charging the jury as follows: 'Manslaughter is the unlawful killing of a human creature without malice, either express or implied, and without any mixture of deliberation whatever, which may be voluntary upon a sudden heat of passion, or involuntary in the commission of an unlawful act, or a lawful act without due caution and circumspection. In all cases of voluntary manslaughter there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion and to exclude all idea of deliberation or malice, either express or implied. Provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should have been an interval between the assault or provocation given and the homicide, of which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and be punished as murder. Voluntary manslaughter shall be punished by confinement and labor in the penitentiary for not less than one nor longer than twenty years. Justifiable homicide is the killing of a human being by commandment of the law in execution of public justice; by permission of the law in advancement of public justice; in self-defense, or in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either. A bare fear of any of those offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears and not in a spirit of revenge." This entire charge is excepted to upon the ground that it left "the jury to believe that the doctrine of reasonable fears as enunciated in said Code section 71 applied to the law of manslaughter, and that said charge was confusing and misleading and was likely to impress the jury that

the doctrine of reasonable fears as applied to the case at bar did apply to the law of manslaughter." The charge is not open to the criticism made upon it. While it is true that the court did charge upon the subject of voluntary manslaughter, the court had passed from that subject before giving section 71 of the Penal Code. This appears from an inspection of the charge. After having charged the statute relating to voluntary manslaughter, the court then, in the language of the statute (Penal Code, § 70), dealt with the subject of justifiable homicide, and it was after the definition of justifiable homicide that he stated to the jury the doctrine of reasonable fears as defined in section 71. It is not probable that the jury were so confused by this part of the charge as to apply it to the charge upon voluntary manslaughter. To hold otherwise would be to assume that the jury would ignore the fact that the court had just charged them on the subject of justifiable homicide, and that their minds would revert to the charge on voluntary manslaughter, and apply to that grade of homicide the charge on reasonable doubt, instead of applying it to the subject of justifiable homicide, to which it naturally referred and was made applicable both from the subject with which the court was dealing and by the position in which it stands in the court's charge.

4-10. The rulings announced in the headnotes numbered four to ten, inclusive, do not require elaboration.

*Judgment reversed. All the Justices concur, Russell, C. J., specially.*