**Quinton David PALMER, By next friend, Marie Palmer, Plaintiff,**

v.

**Roger HALL et al., Defendants.**

**Civ. A. No. 2912.**

United States District Court, M. D. Georgia, Macon Division.

July 29, 1974.

Kyle Yancey, Atlanta, Ga., for plaintiff.

Lawton Miller, Jr. (City Attorney), Macon, Ga., for defendants.

OWENS, District Judge:

Quinton David Palmer, a thirteen year old Macon child, brought this lawsuit against Macon Police Officers Roger Hall and Larry Foster, Macon Mayor Ronnie Thompson and the individual aldermen [1] of the City of Macon for his

1. The defendant Aldermen are Carl Dohn, Dan Tidwell, Sidney Pyles, Dr. W. C. Whitley, Keith Stringfellow, Tom Ivey, Spencer Llorens, Marshall Keen, Rodney L.

being unconstitutionally and unlawfully shot by Police Officer Hall on February 18, 1973. Neither the plaintiff nor any defendant demanded trial by jury; on April 11, 1974, the case came on for a non-jury evidentiary hearing. The evidence, the contentions of the parties and the law having been considered, this now constitutes the court's findings of fact and conclusions of law. Rule 52, Federal Rules of Civil Procedure.

## A. *Basis of Complaint—42 U.S.C. § 1983*

The court has jurisdiction under 28 U.S.C. § 1343(3)[2] of plaintiff's complaint which is founded on 42 U.S.C. § 1983, a statute of law enacted by the Congress of these United States, which provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The Fourteenth Amendment to the Constitution of the United States provides:

> " . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any State deprive any person of life, liberty, or property, without due process of law*; nor deny to any person within its jurisdiction the equal protection of the laws." (emphasis added).

This amendment made the guarantees of the Constitution of the United States applicable to each of the States of these United States and gave Congress "the power to enforce provisions" thereof "against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it . . . Congress, in enacting . . . [what is now 42 U.S.C. § 1983], meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position." (citations omitted). Monroe v. Pape, 365 U.S. 167, 172[3] (1961). An official may abuse his position and subject himself to liability under this section by acting beyond the bounds of his lawful authority under state law—outside the scope of his office; he may likewise subject himself to liability by acting within the scope of his office in an arbitrary manner, grossly abusing the lawful powers of his office. Scheuer v. Rhodes, 416 U.S. 232[4] (1974). Illustrative of the wide range of factual situations encompassed by Section 1983 are the facts which were before the Court in Scheuer v. Rhodes. There the Governor of Ohio, the Adjutant General, the Assistant Adjutant General, the President of Kent State University and certain officers and enlisted members of the Ohio National Guard were sued for the deaths of three students that occurred during the well-publicized episode at Kent State University. The complaints were described by the Court as follows:

> "In essence, the defendants are alleged to have 'intentionally, recklessly, wilfully and wantonly' caused an unnecessary deployment of the Ohio National Guard on the Kent State cam-

---

Smith, Claude Hollis, Ed DeFore, Dr. Andy Lawrence, Edward J. Bond, and Kenneth Taylor.

2. Title 28 U.S.C. § 1343(3) provides:

 The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

 "(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;"

3. 81 S.Ct. 473, 476, 5 L.Ed.2d 492, 497.

4. 94 S.Ct. 1683, 40 L.Ed.2d 90.

pus and, in the same manner, ordered the Guard members to perform allegedly illegal actions which resulted in the death of plaintiffs' decedents. . . . Fairly read, the complaints allege that each of the named defendants, in undertaking such actions, acted either outside the scope of his respective office or, if within the scope, acted in an arbitrary manner, grossly abusing the lawful powers of office." Id. at ——, 94 S.Ct. at 1686, 40 L.Ed. 2d at 96.

### B. *Lawful Powers of Defendant Officials*

 The defendants—Mayor Thompson, the named Aldermen of the City of Macon, and Police Officers Hall and Foster—are each officials of the City of Macon, a municipal corporation created by the legislature of the State of Georgia. 1822 Ga.Laws p. 112, as amended, repealed and superseded—present charter 1927 Ga.Laws p. 1283, as amended. The City of Macon like all other municipal corporations, is a creature of the legislature of this State.[5] It, like all other municipal corporations, does not possess inherent powers; instead, it possesses only such powers as are *expressly delegated* by the legislature. Koehler v. Massell, 229 Ga. 359, 191 S.E.2d 830 (1972). Evidence of express delegation by the legislature is found in the charter of each municipality including the City of Macon or in the general laws of the state. City of Macon v. Walker, 204 Ga. 810, 51 S.E.2d 633 (1949); Town of McIntyre v. Baldwin, 61 Ga.App. 489, 6 S.E.2d 372 (1940). Like the City of Macon, the defendant city officials do not possess inherent powers, powers that usually flow from and are a part of the office that they each occupy. They too derive their authority from the charter of the City of Macon or the general laws of this state.

The legislature of the State of Georgia has not enacted general laws giving any general powers to either Mayors or Aldermen of Georgia municipal corporations. *See* 1933 Georgia Code Annotated Title 69 Municipal Corporations. The powers and authority of the defendants Mayor and Aldermen are therefore derived from the charter of the City of Macon.

 Police power, while it is an attribute of sovereignty and an inherent power of national and state government because the existence of government as well as the social order, security, life and health of the individual citizen depend upon it, is a power possessed by Georgia municipal corporations only if, where and to the extent there has been an express grant by the state. DeBerry v. City of LaGrange, 62 Ga.App. 74, 8 S.E.2d 146; Garrison v. City of Cartersville, 62 Ga.App. 85, 8 S.E.2d 154. The police power of the City of Macon and its officials is thus as found in its charter.

 The office of policeman likewise carries with it no inherent power. Indeed, the office was unknown to the common law and is purely a statutory creation. Burke v. State, 76 Ga.App. 612, 47 S.E.2d 116 (1948). Like the defendants Mayor and Aldermen, the defendant police officers therefore also possess only such power as is given them by the general laws of this state or by the charter of the City of Macon.

The charter of the City of Macon constitutes the mayor and council [consisting of fifteen (15) Aldermen] as the legislative department of the city government. While *they* generally have full

---

5. A municipality is a mere political division of the state, a public corporation having for its object the administration of a portion of the power of government delegated to it for that purpose. Penick v. Foster, 129 Ga. 217, 58 S.E. 773 (1907). While the legislature establishes municipalities, it also alters, amends, enlarges, diminishes or utterly abolishes them, all at its pleasure. Troup County Elec. Mem. Corp. v. Georgia Power Co., 229 Ga. 348, 191 S.E.2d 33 (1972). That cities have no independent existence is demonstrated by State Highway Dept. v. MacDonald, 221 Ga. 312, 144 S.E.2d 363 (1965), holding that the streets of towns and cities and county roads belong to the State of Georgia.

power and authority to do certain enumerated things " . . . and for the preservation of the peace and good order of the same," Section 23, their police power is specifically set forth in Section 74, to wit:

"Sec. 74. Organization and powers of the police department; bonds or collateral; forfeiture.

"The police force of the city shall consist of a chief of police and such other officers and men as the mayor and council may by ordinance prescribe, but such chief, officers and men shall be subject to removal as herein provided. The compensation of all the police force shall be prescribed by ordinance of the mayor and council, but no extra pay or allowance or cost shall ever be awarded them. *They shall have power and authority to arrest all persons in said city guilty of disorderly conduct or public indecency, all persons violating the ordinances of the city, and all persons violating or attempting to violate any law of this State, or committing or attempting to commit any crime, and to confine them in the city prison or in the common jail of Bibb County,* to be brought before the recorder's court for trial or commitment; provided that all persons desiring to give bail for their appearance before such court in bailable cases, shall be allowed to do so." (emphasis added).

Section 77 provides:

"The police department shall be under the immediate supervision and control of the police committee of council and the fire department under the immediate supervision and control of the fire committee of council. In the discretion of the mayor, such committees may be constituted and function separately or may be consolidated into a joint committee. In the event separate committees are determined upon, each of said committees shall consist of five members of council, appointed by the mayor. In the event a joint committee shall be determined upon, it shall consist of seven members of council, appointed by the mayor, but one of such members shall be designated as the fire committee chairman and another as the police committee chairman. (Ga.L.1927, Act No. 119, § 56; Ga.L.1939, Act No. 16, §§ 8, 9; Ga.L.1956, Act No. 51, § 1)"

and Section 79 as applicable here provides:

"The following civil-service rules and regulations for the regulations, government, and control of the said two departments shall be of force:

\* \* \* \* \* \*

"*Rule 16.* The mayor shall be the ranking head and chief in command of both departments."

█ The general law of this state determines the method, scope and limitations of the arrest power given to police officers of the City of Macon by Section 74.

1933 Georgia Code § 27–207 provides:

"An arrest for a crime may be made by an officer, either under a warrant, or without a warrant if the offense is committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be failure of justice for want of an officer to issue a warrant."

In providing for the permissible force that an officer may use in effecting an arrest, the general law differentiates between arrests for crimes that are felonies—major crimes; crimes for which a defendant may be sentenced to more than one year in the penitentiary—and arrests for crimes that are misdemeanors—minor crimes; crimes for which a defendant may be sentenced to twelve months or less in the penitentiary. As to this distinction and the permissible force as to each, note the following from the 1925 unanimous decision of the Supreme Court of Georgia in Paramore v. State, 161 Ga. 166, 129 S.E. 772, where Paramore after being arrested for a misdemeanor fled from the officer, was called upon by the officer to

halt, was shot at by the officer and then shot and killed the officer, to wit:

". . . Since the deceased was, at the time appellant shot him, actually committing a misdemeanor, the appellant under the law had a right to arrest him; but the question is, did he, under the facts, have a right to shoot him? It must be admitted that there is a wide difference between the right to arrest a misdemeanant and to kill him. In Wiley v. State, 19 Ariz. 346, 170 P. 869, L.R.A.1918D, 373, we quoted with approval from Petrie v. Cartwright, 114 Ky. 103, 70 S.W. 297, 59 L.R.A. 720, 102 Am.St.Rep. 274, the following language: 'The notion that a peace officer may, in all cases, shoot one who flees from him when about to be arrested is unfounded. Officers have no such power, except in cases of felony, and there as a last resort, after all other means have failed. It is never allowed where the offense is only a misdemeanor.' This is practically the universal rule. 5 C.J. 426, section 62, states it thus: 'Except in self-defense, an officer has no right to proceed to the extremity of shedding blood in arresting, or in preventing the escape of one whom he has arrested, for an offense less than felony, even though the offender cannot be taken otherwise, a distinction being recognized in this respect between arrests for misdemeanors and arrests for felonies.' In State v. Sigman, 106 N.C. 728, 11 S.E. 520, it is said: 'An officer who kills a person charged with a misdemeanor, while fleeing from him, is guilty of manslaughter, at least.' The reason for limiting the powers of a peace officer in making an arrest of a person committing, or attempting to commit, a public offense of the grade of misdemeanor in his presence is that organized society will suffer less by the temporary escape of such person than it would if the officer should be permitted to take his life, or inflict upon him great bodily harm, to prevent his escape. Most of the acts graded as misdemeanors have no element of moral turpitude, and are offenses simply because the public policy, through the lawmaking body, has so decreed. But even when the act is malum in se, and is graded as a misdemeanor, it is not thought to deserve death at the hands of an arresting officer simply because the offender seeks to avoid arrest by running away. When the offense is bad simply because prohibited, much less should the officer assume to take the offender's life if he disregards orders, and fails to stop when commanded to do so, but keeps on going. Persons charged with petty offenses do not usually run very far nor hide out very long, and if they do not later seek the officer, and surrender to him, it is ordinarily easy enough for the officer to find them and arrest them without bloodshed. But, whether such offenders are ever arrested or not, no peace officer has any right to shoot them because they do not halt when told to do so— 'the theory of the law being that it is better than a misdemeanant escape than that human life be taken.' United States v. Clark (C.C.) 31 F. 710." *Id.* at 175, 176, 129 S.E. at 776.

"In the instant case the offense. for which the defendant was arrested (the offense of having intoxicating liquors in his possession) was a misdemeanor. Under application of the foregoing principles it would have been unlawful for the officer to shoot *at him* with a pistol, while he was fleeing, merely to prevent his escape. A different question would have been presented if the arrest had been for a felony." *Id.* at 176, 177, 129 S.E. at 777.

See also Williams v. State, 120 Ga. 870, 48 S.E. 368 (1904).

Further, it has been held by the Court of Appeals of Georgia in a more recent misdemeanor arrest case that ". . . an officer has no right to follow up one whom he seeks to arrest and attempt to shoot or kill him, if the person sought to be arrested is making no effort to resist arrest, but is only attempting to avoid it

by flight. (McAllister v. State, 7 Ga. App. 541(5), 67 S.E. 221)." Savannah News-Press v. Harley, 100 Ga.App. 387, 389, 111 S.E.2d 259, 263 (1959).

C. *Shooting Another in Self-Defense*

Police Officer Hall, as will be seen from the facts later dealt with, asserts that he shot the plaintiff because of a fear that the plaintiff was going to shoot him—in self-defense.

 Under the general law of Georgia a police officer like any other person, may shoot another in defense of his own life provided that the danger apprehended by the officer is urgent and pressing or apparently so. Williams v. State, 120 Ga. 870, 873, 48 S.E. 368 (1904). "A bare fear . . ." is "not . . . sufficient to justify the [shooting]. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party [shooting] really acted under the influence of those fears . . ." *Paramore, supra,* 161 Ga. at 168, 129 S.E. at 773.

D. *The Facts*

1. *Mayor Thompson*

Defendant Ronnie Thompson, Mayor of the City of Macon since November 8, 1967, a former Alderman, and the acknowledged "acting head" of the police department of the City of Macon, on June 19, 1970, issued the following written order:

RONNIE THOMPSON
MAYOR

CITY OF MACON

GEORGIA 31201

June 19, 1970

EXECUTIVE ORDER

FROM: MAYOR RONNIE THOMPSON

TO: CHIEF J. F. FLYNT

As you know we are receiving more and more threats from a few dissenting people who are interested only in violence.

Anyone trying to cause violence in the City of Macon must be dealt with accordingly.

People engaged in burning, looting, killing and the destruction of property, etc. must answer to the strongest reply available.

Lawlessness designed to produce anarchy and the destruction of the City of Macon will not be tolerated.

No policeman, no volunteer policeman will be asked to face the enemy unarmed. See that we have sufficient arms, ammunition and equipment.

Those people engaged in lawlessness and anarchy must be stopped. SHOOT TO KILL!

[Exhibit P–10]

_____

/s/ Ronnie Thompson, Mayor

This order was widely published in and about the City of Macon and as a matter of common knowledge, rapidly became and continued to be, a topic of public debate. Among the public statements made by Mayor Thompson was the following given in response to a question propounded during a television interview over station WSAV (Savannah) on June 20, 1970, asking whether or not death isn't too extreme:

"I think it's positive, and I think it's permanent, and I think during this period of history it's necessary. If it takes using firearms, if it takes shooting people and killing people in order to enforce the law in the City of Macon, that's exactly what I am going to do, and I'm not going to put up with burners and looters and killers and thugs." (R. 7).

Around September 3, 1970, during an Atlanta television interview conducted by four or five Atlanta newsmen, Mayor Thompson was asked whether or not this order meant that the police were to shoot someone who had stolen a $1.95 shirt. He in effect said, "We would want him shot." (R. 10). Mayor Thompson also said, "If he was engaged in any anarchy or civil disobedience, the police are to shoot whoever is involved." (R. 11).

Mayor Thompson "made a lot of statements" (R. 11) about his "shoot to kill" order and as a matter of common knowledge has continued to do so.

Not only has the Mayor been the acting head of the police department, but he has also assumed active command of the department on various occasions such as in July 1970 when according to the Mayor he was shot at by a sniper and he fired back with a carbine.

Aware that many people listened to the police radio, Mayor Thompson had the simulated sound of a machine gun broadcast over the police radio and as a matter of common knowledge regularly talked at night over the police radio on this subject.

In July 1971, according to the Mayor "There were a band of people out violating the law. The City was under an emergency curfew, and they refused to get off the streets. And they were listening to everything on police radio. The police reported to me that many of them had their radios in their hands listening, and the report came back that they refused to obey the policemen and get off the street—40 or 50 of them. And for their consumption I said, 'Well, get them off the street if you have to take them to the hospital or to the mortuary.' Yes, I made that statement on the radio for their consumption. And they did get off the street." (R. 17).

The newspaper report of that incident stated "When police were alerted that 25 armed people were gathering in one area Thompson issued an order to take them to the hospital or to the mortuary." (R. 20).

Around February 5, 1972 Mayor Thompson "instructed Macon policemen to 'shoot first and ask questions later' while investigating armed robberies and burglaries if there is the 'slightest indication' that they might be harmed." (R. 23).

Around February 17, 1972, defendant Thompson issued an order to shoot on sight any person engaged in armed robbery and that same month issued instructions to the Macon police to shoot first and ask questions later. (R. 26).

In the spring of 1972 Mayor Thompson unvailed his peace symbol which is described in the April 4, 1972, Macon Telegraph as follows:

## Mayor's Peace Symbol Goes 'Pow'

A "peace" symbol designed by Mayor Ronnie Thompson is being used to counter the "peace" symbol adopted by thousnds of anti-war protesters.

Yesterday, the Thompson unveiled a "peace" symbol which the designed and which he will use in promotion work, much as the "Thompson" machine gun lapel pin was used in last fall's mayoral campaign.

The insignia shows a red, white, and blue colored hand which forms a pistol outline with the thumb and index finger extended. The word "peace" is printed below the finger (which apparently corresponds to the gunbarrel of a pistol). Rising from the finger tip is a small puff of smoke, symbolizing that the "peace" symbol has been fired.

A small "Thompson" machine gun links the white cuff of the ogtherwise unseen shirt. The stripes on the hand are colored red, the finger is a solid blue, and the other outlined images are also blue.

Mayor Thompson said yesterday he is using the smaller rectangular sticker to seal outgoing mail. He also has a larger decal type insignia of his "peace" symbol which is suitable to affix to glass. The Mayor said the stickers were not paid for with city funds.

Thompson noted the significance of the "peace" symbol yesterday: "When a person's coming after you this way," he said waving his arms, "do you stop him by doing this?" he asked forming his fingers into the traditional "V" peace symbol.

"I stop 'em this way," he said, holding his hand in the shape of a pistol and saying "pow."

The mayor has repeatedly emphasized his "shoot to kill" ideas in law enforcement, the latest coming almost two weeks ago over the police radio following a late night robbery.

**PEACE** ©

DISTRIBUTED BY MAYOR RONNIE THOMPSON - MACON, GEORGIA

[Plaintiff's Exh. 19].

As a matter of common knowledge defendant Thompson continued to espouse his "shoot to kill" order as he went about his duties as Mayor of Macon and as he campaigned for election to the Congress of the United States during the November 1972 general election. Preceding the incident in question such orders were never rescinded. Indeed, they continued in full force and effect through and including February 18, 1973, and in spite of the pendency of this complaint, continue today.

## 2. *Defendant Aldermen*

The defendant Aldermen have taken no action in the Police Committee or in any meeting of mayor and council to countermand Mayor Thompson's "shoot to kill" orders.

## 3. *February 18, 1973*

Police Officer Roger Hall, with the Macon Police Department since 1969, and Police Officer Larry Foster were patrolling together on Sunday afternoon, February 18, 1973. Defendant Hall was driving. Around 5:00 p. m. they stopped to eat and about 5:36 p. m. they overheard radio instructions to another car to go to Appleton and Progress Streets on a code signal 10 which was shooting, colored males with rifles. Since they were close by, Officers Hall and Foster volunteered to take the call and after doing so proceeded about one-half block to Progress Street.

Officer Hall was still driving. He turned the police car to the right onto Progress at a speed of about 25–30 m. p. h. As he turned the corner he saw three males standing about one hundred fifty yards away at the corner of Progress and Appleton with rifles pointed upwards. Defendant Hall accelerated the car, and the three males broke and ran up on the railroad tracks. The officers drove down Progress to Appleton and as soon as they turned right, parked on Appleton near the railroad tracks, jumped out of the police car and gave chase, Officer Hall going after the plaintiff who had run up on the tracks and in a westerly direction and Officer Foster going after the plaintiff's two companions who had run up on the railroad tracks and in an easterly direction. As he chased, Officer Foster withdrew his .357 Magnum pistol from his holster and the circumstances indicate Officer Hall did the same.

The court has viewed the area in question. Progress is a one-block paved street that begins on the south side of Forsyth Street and continues a distance of some 150 yards in a southerly direction to Appleton Street. Progress Street is somewhat parallel to and westerly of College Street. Appleton Street runs easterly and westerly from its intersection with Progress Street. In an easterly direction it is paved and in a westerly direction it is unpaved. (See picture, Plaintiff's Exh. 4). The unpaved portion of Appleton continues for approximately one hundred feet until it is stopped by an embankment on the top of which are the tracks of the Central of Georgia Railway Company. Where Appleton Street stops there is a path that goes up the embankment and onto the railroad track; at that point the top of the embankment is about five feet above and some thirty-five feet from the center of Appleton Street. The railroad tracks proceed easterly towards Southern Railway's Brosnan Yards and westerly towards Atlanta. At the point where the path comes up on the railroad tracks in a westerly direction the tracks extend onto a steel bridge which supports them as they go over Monroe Street. From the top of the path to the edge of the bridge is some one hundred eight feet; the bridge then begins and continues for eighty-six feet.

The police officers saw the three males run up onto the tracks. It was late in the day, dusk was approaching, and visibility was poor. Plaintiff, a tall twelve year old Negro boy was wearing a heavy coat and was running down the railroad tracks. He did not have a hat on and with both hands he held a Daisy air rifle in front of him as he ran. The Daisy air rifle in question is what is commonly known as a "BB gun"; it has a brown plastic stock, a brown plastic grip, a black frame and barrel and a total overall length of thirty-two inches. The "BB gun" in question has a carbine type hand operated lever that is used to pump the gun preparatory to shooting one "BB".

When Officer Hall reached the top of the path and the tracks and first saw the plaintiff running down the tracks, the plaintiff according to Officer Hall was then some 60 to 100 yards away. According to Officer Foster who

could hear but not see what went on, Officer Hall twice yelled "stop, drop the rifle." The plaintiff did not stop. When Officer Hall was within some 40 yards of the plaintiff and he and the plaintiff were both running in a westerly direction, according to Officer Hall the plaintiff "looked back" at him (R. 163) in such a manner as to cause the barrel of the "BB gun" to turn towards him. When he saw the barrel of the gun come around, he fired his .357 Magnum revolver. The bullet entered the rear of plaintiff's left leg about half-way between the back of the knee and the lower portion of his buttocks at a point somewhat towards the inside portion of his left leg. It exited about four inches above the top of the knee cap and several inches toward the inside of the front of the left leg.

Officer Hall had presumed that what he saw in the plaintiff's hand was a rifle. As far as he then knew the plaintiff had been doing nothing more than shooting a rifle in the city which he also knew was a misdemeanor.[6] While he had heard of Mayor Thompson's "shoot to kill" and "shoot first and ask questions later" orders, he says he shot only because he was in fear of his life. (R. 48–50).

The plaintiff agrees with the officer's description of his running down the tracks but says that he did not hear the officer order him to stop and did not even look back at the officer. (R. 91). He denies in any way pointing his "BB gun" towards Officer Hall. He says that he first knew that the officer was behind him when he heard the explosion of the gun and felt the bullet enter his leg.

According to The Gunner's Bible by Bill Riviere, 1973 Revised Edition, the .357 Magnum handgun that Officer Hall fired is second in the handgun power

field and has a muzzle velocity of more than 1410 feet per second.

The path of the bullet—entered the rear and towards the inside of plaintiff's left leg and exited the front and towards the inside of plaintiff's left leg —shows that at the time the bullet entered plaintiff's body, plaintiff's body was positioned so that the toes of both feet were away from Officer Hall and the heel of each foot was towards Officer Hall; plaintiff's direction of body travel was straight ahead and away from Officer Hall; the entire rear of plaintiff's body was towards Officer Hall. Since Officer Hall was some 40 yards or 120 feet away from plaintiff when he fired his .357 pistol and since the bullet traveled at a speed of at least 1410 feet per second, plaintiff could not have moved or changed his body position to any extent in the less than one-tenth of a second that it took the bullet to travel to him. The court therefore finds that at the time Officer Hall fired his .357 pistol at the plaintiff, the rear of plaintiff's body was towards him—Officer Hall was looking at plaintiff's back.

After he was shot the plaintiff felt pain, saw blood running down his leg and fell on to the tracks near the westerly end of the bridge. See Plaintiff's Exhibit 11. Officer Hall came up, saw the plaintiff and his condition and immediately used his belt to stop the bleeding. Officer Hall saw that plaintiff's gun was a "BB gun"; Officer Foster ran up, observed that the plaintiff had been shot, grabbed the "BB gun" and went to the patrol car to call an ambulance. Officer Hall picked up David Palmer and ran with him to the patrol car. The plaintiff was then carried by ambulance to the emergency room of the Macon Hospital which is about one-half mile away. After going to the emergency room, Officers Hall and Foster charged plaintiff David Palmer as a ju-

6. An ordinance of the City of Macon then provided:
 "Sec. 14–24. *Firearms—Shooting Inside City Prohibited.*

"It shall be unlawful for any person to discharge a firearm and airgun within the City. (Code 1947, Section 72–101)."

venile with shooting in the city and aggravated assault. According to Officer Hall the charges were from evidence at the scene—the "BB gun" and a paper bag containing robins, the latter having been found after the plaintiff was shot. Officer Hall knew that aggravated assault was a felony.

Dr. Triana examined plaintiff in the emergency room, found that there was a trauma to his left body which entered posteriorly and exited anteriorly, found an absence of pulse below the wound and determined there was an injury of the main artery—the femoral artery—going down to plaintiff's leg. Plaintiff was taken to the operating room. During the operation Dr. Triana found that the bullet had pierced the main vein and artery—the femoral vessels—that supply the leg. Using a piece of vein obtained from the right thigh, the artery was reconstructed. After doing so an absence of pulse in the foot was noted. The cause could not then be determined, so at the end of about a three hour procedure the wound was closed, having in mind that if a pulse was not regained in about eight hours another operation would have to be performed.

The following morning Dr. Smith examined the plaintiff and finding no pulse, performed an arteriogram which showed a blood clot in the area of the injury. Another operation was performed and the artery was again reconstructed with another piece of vein from the same leg. The plaintiff remained in the hospital until February 27, suffered after leaving the hospital but with the passage of time has virtually fully recovered. The doctors who treated plaintiff are of the opinion that he will not have any permanent difficulties. The plaintiff, however, says that he cannot now run and play to the same extent that he could before being shot. If he runs or exercises or anything, he has to stop and rest; and if he exercises too much, his leg will swell.

The plaintiff has not gone to juvenile court in connection with the juvenile charges placed by Officers Hall and Foster.

### E. *Liability*

#### 1. *Officer Foster and Malicious Abuse of Process*

The court has already found that there is no causal relation between the actions of Officer Foster and the shooting of the plaintiff. He neither *subjected* nor *caused the plaintiff to be subjected* to the deprivation of any rights, privileges and immunities. He simply did not have anything to do with the shooting of the plaintiff.

The court has also already found that there is no liability on the part of any defendant growing out of Officers Hall and Foster placing juvenile charges against the plaintiff for shooting in the city and aggravated assault. Even though there was absolutely no foundation for a charge of aggravated assault and at most only circumstantial evidence of shooting a "BB gun" and even though the reason for their placing such charges under such circumstances is hard to understand, David Palmer was not in any way injured or damaged as a result thereof.

Accordingly, orders finding no liability as to Officer Foster and no liability as to any defendant arising out of the juvenile charges placed against plaintiff have already been entered.

#### 2. *Defendant Aldermen*

For any or all of the defendant Aldermen to be liable under 42 U.S.C. § 1983 the facts must show an act or failure to act under circumstances where there is an affirmative duty to act. Huey v. Barloga, 277 F.Supp. 864, 873 (N.D.Ill.1967). The facts of this case do not show that any of the defendant Aldermen acted. The facts do not show any circumstances requiring affirmative action by any or all Aldermen. Some may say that the police committee or council should have affirmatively countermanded the Mayor's "shoot to kill" orders. This contention overlooks

the provisions of Macon's city charter which state that mayor *and* council constitute the legislative department. They stand on equal footing. Neither has the duty to supervise and/or take the other to task for what either does or fails to do as elected city officials. There is therefore no liability on the part of the defendant Aldermen.

### 3. *Mayor Thompson*

 Unlike the defendant Aldermen, Mayor Thompson without any lawful authority from the general laws of this state or Macon's city charter to do so, ordered and directed police officers of the City of Macon to exceed the lawful authority given them under the city charter and general state law by "shooting to kill" not under circumstances where killing is permitted by law but under circumstances defined by Mayor Thompson—". . . Those people engaged in lawlessness and anarchy must be stopped. SHOOT TO KILL!"— ". . . If it takes using firearms, if it takes shooting people and killing people in order to enforce the law in the City of Macon, that's exactly what I am going to do . . . ."—"If he (a $1.95 shirt thief) was engaged in any anarchy or civil disobedience, the police are to shoot whoever is involved."—". . . Well, get them off the street if you have to take them to the hospital or to the mortuary."—"shoot first and ask questions later." As shown by the court's previous discussion of the Mayor's lawful authority, he does not possess the power as an elected public official to redefine, to so change the law of this State or the charter of the City of Macon; he does not possess the power to order police officers of the City of Macon to perform their duties in an unlawful manner.

Mayor Thompson in ordering and instructing police of the City of Macon acted in his capacity as Mayor of the City of Macon and thus "under color of law" under 42 U.S.C. § 1983.

While Mayor Thompson did not pull the trigger or directly order it pulled, his "shoot to kill" orders and related statements throughout the period of June 19, 1970, until this incident, created the feeling of authority on the part of Macon policemen including Officer Hall that caused Officer Hall to do what he did to the plaintiff. Mayor Thompson just as much as Officer Hall, caused the plaintiff to be shot, and he is liable under 42 U.S.C. § 1983 the same as Officer Hall is.

### 4. *Officer Hall*

 As already stated, the Fourteenth Amendment to the Constitution of the United States provides that no state shall deprive any person of his life or liberty "without due process of law." Among the plaintiff's liberties was the liberty to be free from unlawful attacks upon the physical integrity of his person. Screws v. United States, 325 U.S. 91[7] (1945).

 To be deprived of liberty "without due process of law" means to be deprived of liberty without authority of the law.

 As already stated, Officer Hall under State law and Macon's city charter had the authority to arrest for violations of state law. He had no warrant for the arrest of plaintiff or his two companions; having no warrant he was required to have probable cause—to have observed or have reliable information of, the violation of a law by the plaintiff. To have facts which would warrant a man of reasonable caution to believe that an offense has been committed. Johnson v. State, 230 Ga. 196, 198, 196 S.E.2d 385 (1973). To be able to arrest plaintiff for shooting in the city, a misdemeanor, or anything else. Officer Hall admittedly at most suspicioned that David Palmer had been violating a city ordinance prohibiting shooting in the city,[8] and Officer Hall knew a violation of this ordinance was a misdemeanor. Therefore, regardless of whether or

---

7. 65 S.Ct. 1031, 89 L.Ed. 1495.

8. See note 6, *supra.*

not Officer Hall had probable cause to arrest plaintiff for a misdemeanor, Officer Hall under the laws of this state had no right to follow up plaintiff who he was seeking to arrest and attempt to shoot or kill him since the plaintiff David Palmer was making no effort to resist arrest but was only fleeing. Savannah News-Press v. Harley, 100 Ga.App. 387, 389, 111 S.E.2d 259 (1959). It is thus the court's conclusion that Officer Hall by chasing and shooting at the subject fleeing alleged misdemeanant, exceeded his lawful authority under the laws of Georgia and the charter of the City of Macon.

Officer Hall contends that regardless of the fact that he exceeded his lawful authority as a police officer, he did only what all citizens have a right to do—he shot at the plaintiff in self-defense. Officer Hall was some 40 yards behind the plaintiff. He was running, and plaintiff was running. Plaintiff's back was to him. Plaintiff was holding a "BB gun" in front of his body. It was late in the afternoon. Officer Hall could only have imagined that his life was going to be in danger because there are no facts to indicate that from Officer Hall's viewpoint his life was in apparent danger. "A bare fear . . ." is "not . . . sufficient to justify the [shooting] . . . ." Paramore v. State, 161 Ga. 166, 168, 129 S.E. 772, 773 (1925). In the court's best judgment, Officer Hall did not shoot in self-defense.

 For Officer Hall to be liable under 42 U.S.C. § 1983 for the shooting of the plaintiff the following must be established by the plaintiff:

(a) That Officer Hall knowingly shot and wounded the plaintiff David Palmer.

(b) That Officer Hall at the time of the shooting acted under color of law.

(c) That Officer Hall's acts and conduct deprived the plaintiff of his right under the Constitution of the United States not to be denied or deprived of his liberty without due process of law.

(d) That Officer Hall's acts and conduct were the proximate cause of plaintiff's injuries and consequent damage.

For reasons already stated the court has already found that items (a), (c) and (d) have been established factually and legally.

 Item (b) involves "under color of law." For Officer Hall to be liable under 42 U.S.C. § 1983 his unlawful acts must be done while he is purporting or pretending to act in the performance of his official duties as a policeman; the unlawful acts must consist in an abuse or misuse of power which is possessed by him only because he is a police officer; and the unlawful acts must be of such a nature, and be committed under such circumstances, that they would not have occurred but for the fact that Officer Hall was a policeman purporting to exercise his official powers. Federal Jury Practice and Instructions by Devitt and Blackman, § 87.08, p. 290.

Officer Hall in unlawfully shooting plaintiff David Palmer was acting as a police officer of the City of Macon. He thus was acting under color of law. Item (b) is therefore also established, and Officer Hall is liable to plaintiff under 42 U.S.C. § 1983. Like Officer Hall, Mayor Thompson is also liable.

F. *Damages*—

1. *Actual Damages*—

 The plaintiff David Palmer is first entitled to be awarded a sum which will compensate him reasonably for any pain, suffering and mental anguish already suffered by him and proximately resulting from the unlawful actions of Officer Hall and Mayor Thompson, and likewise for any pain, suffering or mental anguish that he is reasonably certain to suffer in the future from the same cause. The court after careful consideration awards the plaintiff $35,000.00 actual damages.

2. *Punitive Damages—*

 In addition to actual damages for pain and suffering, both past and future, the complaint contains a prayer for punitive damages against the defendants Mayor Thompson and Defendant Hall. It is clear beyond peradventure that punitive damages may be awarded in suits under section 1983. Mansell v. Saunders, 372 F.2d 573 (5th Cir. 1967); Basista v. Weir, 340 F.2d 74 (3rd Cir. 1965).

 The court in Sexton v. Gibbs, 327 F.Supp. 134 (N.D.Tex.1970), aff'd, 446 F.2d 904 (5th Cir. 1971), found that punitive damages are appropriate where wilful or malicious violations of constitutional rights were shown. In Callahan v. Sanders, 339 F.Supp. 814, 819 (M.D. Ala.1971), the court stated:

> "The general rule as to punitive damages is that they may be imposed if defendant has acted wilfully and in gross disregard for plaintiffs' rights."

(citations omitted).

Both Mayor Thompson and Officer Hall are conclusively presumed to have known the law of this state and to have known that their respective courses of conduct were unlawful under the laws of this state. Copeland v. Dunehoo, 36 Ga.App. 817, 822, 138 S.E. 267 (1927). And this being true, Officer Hall's act of shooting at the plaintiff and Mayor Thompson's issuance of his "shoot to kill" orders over an extended period of time in the court's best judgment constituted a wilful course of conduct and gross disregard for the rights of plaintiff in common with all other citizens.

 Reduced to its essential facts, this case involves a twelve year old boy who was shot from the rear as he fled from a pursuing police officer. The facts as found clearly satisfy the standard delineated above. As far as Mayor Thompson is concerned, he must recognize that he is powerless to unilaterally suspend the constitutional rights of any citizen in the fashion evidenced by the circumstances of this case. An award

of punitive damages is therefore appropriate and punitive damages in the amount of $15,000.00 are awarded.

*Conclusion*

For the foregoing reasons, it is ordered, adjudged and decreed that the plaintiff have and recover the sum of $50,000.00 in actual and punitive damages jointly and severally against the defendants Ronnie Thompson and Roger Hall.

So ordered.